Filed 7/31/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S050102 |
| v. | ) | |
| | ) | |
| PAUL LOYDE HENSLEY, | ) | |
| | ) | San Joaquin County |
| Defendant and Appellant. | ) | Super. Ct. No. SC054773A |
| _____ | ) | |

A jury convicted defendant Paul Loyde Hensley of the first degree murder and robbery of Larry Shockley, the burglary of his home, and the theft of his car; the first degree murder and robbery of Gregory Renouf and the burglary of his home; the attempted murder and robbery of Stacy Copeland; the robbery of Scott Rooker; and escape from county jail.[1] As to both murders, the jury found true special-circumstance allegations of robbery-murder and multiple-murder.[2] The jury also found that defendant used a firearm in the commission of every offense

---

[1] Penal Code sections 187, subdivision (a), former section 189, as amended by initiative measure, Proposition 115, effective June 6, 1990, sections 211, 459, former section 664, as amended by Statutes 1986, chapter 519, section 2, page 1859, former section 4532, subdivision (b), as amended by Statutes 1992, chapter 5, section 2, page 25, and Vehicle Code, former section 10851, subdivision (a), as amended by Statutes 1990, chapter 1564, section 2, page 7375. Further undesignated statutory references are to the Penal Code.

[2] Section 190.2, former subdivision (a)(3), (a)(17), as amended by Statutes 1989, chapter 1165, section 16, page 5586.

except the burglary and escape charges, and that he inflicted great bodily injury during the Copeland crimes.[3] The jury was unable to reach a penalty verdict, and the trial court declared a mistrial. This appeal is automatic following the second jury's verdict of death.[4] We reverse the death judgment due to prejudicial juror misconduct (see *post*, pt. II.C.1.), and remand for retrial of the penalty phase and resentencing on all counts. The judgment is affirmed in all other respects.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. *Prosecution evidence*

On the evening of October 15, 1992, defendant robbed Scott Rooker, the cashier at an ice cream store in Stockton.

The next morning, defendant lured his father-in-law, 54-year-old Larry Shockley, to a road in rural San Joaquin County. There, he shot Shockley in the head and face, then stole his wallet, keys, and Oldsmobile station wagon. He also broke into Shockley's Lodi home, ransacked it, and stole other items.

The next day defendant picked up prostitute Stacy Copeland, paying her $50 for her services. After the transaction, defendant shot her in the back, stole her purse, and abandoned her in a field. Copeland became paralyzed from the waist down. That evening, defendant unsuccessfully tried to buy a police scanner with one of Shockley's business checks.

---

[3] Former section 12022.5, as amended by Statutes 1990, chapter 41, section 3, page 246, and former section 12022.7, as amended by Statutes 1979, chapter 145, section 17, page 341, both repealed and reenacted by Statutes 2010, chapter 711, sections 4 and 5.

[4] California Constitution, article VI, section 11, subdivision (a); section 1239, subdivision (b).

2

Later that night, defendant met 40-year-old Gregory Renouf outside a pornography shop in Sacramento. The two agreed to meet for a sexual tryst in a deserted warehouse district. Each drove his own car to the area. There, defendant shot Renouf five times, then stole his wallet and keys. He ransacked Renouf's apartment, stealing several items including Renouf's checkbook and checks made out to him. Defendant cashed three of the stolen checks.

Defendant was arrested on October 18, 1992, when a Sacramento police officer found him sleeping in Shockley's stolen Oldsmobile. Defendant had a bag of cocaine-based drugs in his pocket. A test of his blood revealed methamphetamine.

Defendant confessed in detail to all of these offenses. He showed officers where he had committed or discarded items associated with the crimes. A portion of defendant's conversation with officers during this excursion was recorded.

Cashier Rooker identified defendant as the robber of the ice cream store. When arrested defendant was carrying a wallet stamped "Larry" and a loaded .25-caliber semi-automatic handgun. Firearms expert Michael Giusto testified it was "most likely" the Shockley murder weapon. A store employee testified defendant tried to write a check from Shockley's account.

Stacy Copeland testified defendant shot and paralyzed her. Giusto concluded a shell casing recovered from the Oldsmobile had been fired from defendant's gun. A bullet recovered from Copeland's back had the "same general rifling" characteristics as those left on bullets test shot from defendant's weapon. Defendant's fingerprints were recovered on items in Copeland's purse.

As to Renouf's murder, Giusto concluded defendant's handgun had fired the shell casings found at the murder scene, and "most likely" fired all but one of the bullets that killed Renouf. The remaining bullet fragment was too small to compare. A cigarette pack found at the murder scene bore defendant's fingerprint,

3

and he was seen on stairs leading to Renouf's apartment. When arrested he was carrying Renouf's driver's license, check cashing card, paycheck, and checkbook.

On June 19, 1993, defendant and five other inmates escaped from the San Joaquin County Jail by breaking a window, jumping about 15 feet to the ground, and climbing over a six-foot-high fence. He was captured four days later in San Francisco.

2. *Defense evidence*

Charles Flynn testified he was a friend of victim Shockley. After Shockley's wife died in July 1992, Shockley "went to pieces." He was apparently involved in a dispute with his stepdaughter and wanted custody of her children. Shockley said he wanted someone to kill her. Shockley mentioned the same subject several weeks later.

On cross-examination, Flynn recalled that sometime before his wife died, Shockley said that defendant had hit and threatened him because Shockley owed him money. Shockley was afraid of defendant "[t]o some extent."

Stockton Police Sergeant Steve Johnson interviewed victim Stacy Copeland several days after her attack. She reported being shot as she was getting out of the car.

The parties stipulated that on May 27, 1981, murder victim Renouf had been arrested for approaching "a male undercover Sacramento police officer in a public place with the intent to engage in a lewd act."

Gary Harmor, a serology expert, testified that he had examined blood samples from defendant, Shockley, Copeland, and Renouf. None of the samples shared the same genetic markers. Renouf's blood was found on the pants and shirt defendant had discarded in a dumpster.

4

San Joaquin County Sheriff's Sergeant Michael Junker testified that after a struggle he and other officers arrested defendant in San Francisco four days after his escape from jail. Defendant at first denied he was Paul Hensley, but admitted his identity when his wife's name was found tattooed on his shoulder.

## B. Second Penalty Phase

Because we reverse the penalty judgment on the ground of juror misconduct, an extended recitation of the second penalty phase evidence is unnecessary.

### 1. *Prosecution evidence*

In summary, the prosecution presented evidence similar to that admitted at the guilt phase. It also presented facts related to defendant's three prior felony convictions, unadjudicated crimes, and victim impact testimony.

### 2. *Defense evidence*

Defendant also produced evidence similar to that introduced at the guilt phase, along with evidence about his childhood, marriage, family, employment history, and drug use. Expert testimony was presented on the effect of methamphetamine, conditions in a maximum security prison, and predictions of defendant's future behavior in prison.

### 3. *Rebuttal evidence*

Various sheriff's deputies recounted defendant's jail misconduct and further details of his escape.

### 4. *Defense surrebuttal*

Several sheriff's employees gave further testimony about defendant's jail conduct. Other witnesses recounted defendant's assistance to a fellow inmate, and the conditions of defendant's incarceration. Jail psychiatric technicians testified regarding defendant's medication and conversations with them.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. *Change of venue motion*

Defendant sought a change of venue. The motion was denied without prejudice subject to renewal after voir dire. Defendant now assigns error. Because he did not renew his motion after voir dire, the claim is forfeited. (*People v. Hart* (1999) 20 Cal.4th 546, 598.)

It also lacks merit. Defendant has not established that it is " 'reasonably likely that a fair trial was not in fact had.' " (*People v. Proctor* (1992) 4 Cal.4th 499, 523, italics omitted; see *Beck v. Washington* (1962) 369 U.S. 541, 556 [no "constitutional infirmity" in denying a change of venue motion "if petitioner actually received a trial by an impartial jury"].) All seated jurors to whom defendant refers stated on their questionnaires they could put aside any pretrial publicity and decide the case solely on the evidence at trial. (*Beck*, at p. 557; *Proctor*, at p. 527.)[5] Nor is this an extraordinary case in which the publicity was "so pervasive and inflammatory" that prejudice is presumed and the jurors' assurances of impartiality should not be believed. (*People v. Prince* (2007) 40 Cal.4th 1179, 1216-1219 (*Prince*).)

Defendant's failure to exhaust his peremptory challenges or renew his venue motion support "a reasonable inference that the defense did not believe that

---

**5** On her questionnaire, Juror G.W. recalled seeing an article in a Lodi newspaper about the "October 16th murder," and responded both "[y]es" and "[n]o" when asked if anything she had seen or heard about the case had prejudiced her against defendant, noting: "Only the reaction that a sad crime has been committed. I don't approve of his actions." On voir dire, she said, "No" when asked if she was leaning one way or the other on penalty based on what she had read.

pretrial publicity had prejudiced the seated jurors . . . ." (*Prince*, *supra*, 40 Cal.4th at p. 1216.)

## 2. Batson *motion*

Defendant contends the prosecutor exercised peremptory challenges to remove a Black prospective juror and a Black prospective alternate because of their race. (*Batson v. Kentucky* (1986) 476 U.S. 79, 89; *People v. Wheeler* (1978) 22 Cal.3d 258, 272, 276-277.)[6]

### a. *Factual background*

Before the parties exercised their peremptory challenges, defense counsel mentioned that there appeared to be only two Black prospective jurors remaining in the venire: Prospective Jurors H.B. and F.C. (Defense counsel noted that he had a pending challenge to Prospective Juror D.C. for cause, implying that D.C. was also Black.) The prosecutor ultimately challenged H.B. and F.C.

Prospective Juror H.B. worked as a systems analyst for 21 years in the Army and 12 years in the federal government. He had previously served on two juries: a court martial and a robbery case. He belonged to a disabled veteran's association, and owned a pistol. His father had been murdered when H.B. was 10 years old.

Asked on the juror questionnaire whether he believed there were "any problems in our country bigger than crime," Prospective Juror H.B. wrote, "I am not sure I understand the question." He gave a similar response to a question that asked him to describe his "general feelings regarding the death penalty." He did

---

[6] Based on his videotaped statement to the police and his mug shot, defendant appears to be White. Murder victims Shockley and Renouf and attempted murder victim Copeland were White. Robbery victim Rooker was probably also White, as defendant's confession describes him as having dirty blond hair.

not answer a question asking for his "general opinions about psychology and psychiatry." Asked, "Do you believe in the adage, 'an eye for an eye,' " he wrote "No." He "[d]isagree[d] [s]omewhat" with the statement that "[a] person who, while intoxicated on alcohol or illegal drugs, kills another person, deserves the same punishment as one who kills while sober." He wrote nothing in the questionnaire's request for comment on his response.

Prospective Juror H.B.'s questionnaire indicated he "[d]isagree[d] [s]omewhat" with a statement in question No. 62 that, "[a]fter a fair trial and a finding of guilt, the State should execute everyone who unlawfully and intentionally murders another human being." He gave the same response to a statement in the next question: "After a fair trial and a finding of guilt, the State should execute everyone who intentionally murders another human being during the commission of a dangerous crime." To both questions H.B. commented, "I bel[ie]ve the jury should decide the punishment . . . following the instructions of the judge — Interpretation of the law."

On voir dire, the trial court explained that at the penalty phase, "it's really not a question of law . . . as it is the question of the juror's personal feelings," and that jurors must "put . . . moral evaluations on [the] factors in aggravation and mitigation to decide what . . . the appropriate penalty is." The court asked H.B.: "Do you think that's okay?" H.B. replied, "No, no. This is not okay. I was —" The court interrupted to note that H.B. had completed his questionnaire before hearing the court's preliminary instructions about the penalty process. H.B. attempted to clarify his response to question No. 62: "Only thing I'm saying here is if that's the state law, based on the instruction —" The court said: "That's not the law. I'm sorry. It's just if you found yourself having to vote one way or the other, life without parole or the death penalty, that's all we are asking there. I think —" H.B. interjected: "You talking 62? Question 62?" The court replied:

"62. Yeah. . . . I don't want to put words in your mouth, but we are not asking you to . . . make a finding on that. Let's go on to something else here."

Prospective Juror H.B. also mentioned that he had no hearing in his right ear. He agreed with defense counsel that he nonetheless was "able to hear everything that's going on."

Defense counsel asked about H.B.'s service as a court martial juror. H.B. said, "[I]f I remember correctly, it was murder also." Counsel asked if it had been a death penalty case, and H.B. replied, "I believe he got life." The prosecutor later asked H.B. if the death penalty had been an option in the court martial proceeding, and H.B. replied: "I can't recall exactly what instruction we received . . . ."

H.B. told the prosecutor that he did not "believe that two wrongs make a right." When the prosecutor asked H.B. if he believed in the principle of an "eye for an eye," he replied: "Not that I don't believe in it. I [am] just saying I don't believe that any statistics or anything have shown that you have the death penalty that — . . . that reduce[s] the taking of a life." The prosecutor asked H.B. for his views about "using the death penalty as a punishment [for] committing a wrong." H.B. replied, "If that's the law, I can . . . hear the evidence and receive the instruction, and I can recommend the death penalty if the condition has been met."

The prosecutor noted that intoxication and drug use "may be an issue in this case," and asked if H.B. could "look at a person's conduct, external factors, decision-making process, over a period of time and make some reasonable determinations about a person's drug [use] or intoxication at a certain time?" H.B. responded, "Well, I am going to have to listen to what is presented, because I can only be basing on what is presented during the course of the trial." Noting that H.B. had been "around soldiers all [his] life," and "must have seen them in various stages of intoxication," the prosecutor asked: "Do you believe that a person can be mildly intoxicated to a heavy influence, where they have no recollection of the

9

events, even pass out?" H.B. replied, "Yes." The prosecutor asked, "Do you believe there is a sliding scale among that intoxication?" H.B. replied: "Yes. I feel that there is some degree of intoxication." The prosecutor asked, "Do you believe you can look at a person's conduct over a period of time, driving conduct, mannerisms, how he's moving, a day's activities and make some rational[] decisions about his intoxication levels?" H.B. replied: "I think that's kind of dangerous due to my experience. I have seen diabetics. I have seen other illnesses that kind of reflect[] the same type of behavior." He subsequently stated: "But you asked me the question could I look at them. What I'm saying, I wouldn't try to do that. What I will look at is what is presented on the case. The evidence that is presented."

The prosecutor noted H.B. had not given his views about psychologists and psychiatrists, and inquired whether H.B. had any "preconceived ideas" about them. H.B. replied: "No, I don't have any preconceived ideas. I would say that it depends what the issues are and what the psychiatrists say. And what type of . . . reputation and so on. I will have to hear that before I can say that I believe him or not." The prosecutor asked, "You are not going to automatically accept a psychologist's or psychiatrist's testimony because they are a so-called expert?" H.B. answered, "No, I'm not going to automatically accept and I'm not going to automatically disapprove it either."

Prospective Juror F.C. had majored in social science in college and was an elementary school teacher. She had six children, 14 grandchildren and one great-grandchild.

On the jury questionnaire, Prospective Juror F.C. answered "No" to the question whether there were "any problems in our country bigger than crime." When asked her "general feelings regarding the death penalty," she wrote: "I feel that thou shalt not kill but I also feel that there are circumstances that justify the

10

death penalty. Each situation has to be studied extensively on an individual basis." She "[a]gree[d] [s]omewhat" that "[a] person who, while intoxicated on alcohol or illegal drugs, kills another person, deserves the same punishment as one who kills while sober," commenting: "Well, a person intoxicated is not of sound mind. Of course a person sober may not be of sound mind either."

On voir dire, defense counsel asked if Prospective Juror F.C. had "strong feelings against people who use illegal drugs." She replied: "Because it's so bad for the people," and added, "Look what it does to them." When defense counsel asked, "would [it be] hard for you to be fair to [defendant] if there were evidence that he had used illegal drugs," she replied: "I don't know if it would make me be unfair. . . . I just think drugs are bad because it makes the people do things that they wouldn't ordinarily do." She added: "And brings them down from . . . maybe important people to nothing. That's . . . my feeling against drugs. Because they [are] just so devastating to people."

The prosecutor asked Prospective Juror F.C. about her statement on the questionnaire that she believed in the principle "Thou shalt not kill." F.C. said: "Well, I mention it because I go to church, and it's in the Bible, one of the commandments . . . . So I put it down. Because that's what the commandment says. And I believe everything the Bible says."

The prosecutor challenged H.B. and F.C. After the latter challenge, defendant made a *Wheeler* motion, stating that the venire had only two Black prospective jurors, and the prosecution had exercised peremptory challenges against both of them. The trial court said, "I believe those are the only two Black jurors we had on the group that survived," noting that there had been other Black candidates on "the prospective jury list." The court asked the prosecutor to state his reasons for the challenges.

11

The prosecutor said he found Prospective Juror H.B. "very factually oriented, with very little emotion and very little commitment either towards the death penalty or against the death penalty." The prosecutor was "very concerned that [H.B.] had sat in a case of extreme importance in a court martial that may have involved the death penalty . . . [but] he [could not] recall whether or not there was a death penalty verdict handed down or life sentence." In the prosecutor's view, H.B.'s "lack of understanding and failure to remember such an important issue in his past did not give him the sensitivity that this case required." H.B. had "[z]ero emotion regarding his experience and what may have been a death penalty case," and contrasted his "lack of memory" regarding that incident with a different prospective juror who had previously sat in a death penalty case about 14 years earlier and who "talked about the extreme emotional commitment it was." The prosecutor said that H.B.'s "lack of emotion, lack of memory regarding such an important case, concerned [him] very greatly."

The prosecutor also noted that H.B.'s "emotions during questions" and his "mannerisms . . . in court" were "very short, very noncommittal," and that he had "no opinion regarding psychology," and "[n]o opinion regarding the death penalty." In the prosecutor's view: "His answers were short, to the point, and one of extreme precision. He has an extensive military background. Computer analyst. I found that [he] did not have the sensitivity required." The prosecutor said that H.B. had "[v]ery little emotional attachment," and "I found his attitude to be very mechanical, very stiff." The prosecutor noted that H.B.'s lack of emotion when describing his feelings included H.B.'s description of "the murder of his father."

The prosecutor also noted that "one of [his] major concerns with" Prospective Juror H.B. was his answer to question No. 62. The court remarked: "I tried to explain to him it wasn't a question of law[] whether you pick a death

12

penalty or pick a life without parole. Once I explained it to him, he didn't seem to grasp that." The prosecutor said that the court "went in extensively on question 62 to try and get the personal sentiment of [H.B.], and he continually went back to the law." The prosecutor said he was "bothered" by H.B.'s "inability to come out with any type of personal sensitivity, [to] give his personal insight as to how he felt," and by H.B.'s "mechanical approach to questioning, his mannerisms, and how he sat in the chair reflected those attitudes." The prosecutor also noted that H.B. had lost hearing in his right ear, and because of H.B.'s lack of understanding of the questions, the prosecutor had been concerned whether he "was actually, in fact, hearing us." The court said, "Well, the [c]ourt felt either he didn't understand it, or was avoiding it, or there was some difficulty getting across."

The prosecutor also said he was "bothered" by Prospective Juror H.B.'s "reluctan[ce] to look at objective factors of intoxication as an indicator," and "would not like objective factors of intoxication." The prosecutor noted that "[t]his case has a witness list that includes psychological, psychiatric testimony and drugs," and that in the prosecutor's view "objective[,] reasonable factors would be a very important part of this case." H.B.'s "reluctance to embrace those" factors, the prosecutor said, was "one of [the prosecution's] major concerns."

The court ruled that the "prosecution has a good, legitimate reason for excusing [Prospective Juror H.B.] under the circumstances." The court agreed that H.B. "was very mechanical," and observed he sat "bolt upright in his chair and seemed to be very guarded in what he said."

As to Prospective Juror F.C., the prosecutor said she appeared to have "an attitude problem." He explained that each time the clerk had taken roll, she had apologized in advance for any mispronunciations, yet both times F.C. had harshly corrected the clerk's error in saying her name. The prosecutor said, "I find her not being one with an attitude of openness and understanding as to the jury process."

13

The prosecutor expressed concern because Prospective Juror F.C. had many children and grandchildren, explaining that "her sensitivity to the family background is something we need to look at," and that her "extensive background of children" would make her "sensitive to the nature of children in this case." Apparently referring to victim Shockley, the prosecutor noted that he may have had child abuse allegations made against him and that F.C. had "strong feelings regarding . . . child molestation." The prosecutor also noted that F.C. believed in the principle "[t]hou shalt not kill," and was reluctant to "embrace the death penalty." In addition, he said, F.C. claimed not to be able to recognize objective factors of intoxication or drug use even though she lived in an area where "there is an extreme drug problem," and reported witnessing what she thought were drug transactions. The prosecutor concluded F.C. considered drugs "an excuse," and he "did not feel she would be an objective juror." He also pointed out that F.C. had an unpleasant experience when visiting the county jail.

The trial court said it was "satisfied" that the prosecutor's peremptory challenge to Prospective Juror F.C. did not violate *Wheeler*. As to both prospective jurors, the court found "the prosecution has dutifully explained the excuses given and has justified them in my mind regarding the fact that he did excuse them . . . [f]or reasons other than that for race."

### b. Analysis

A party who excludes prospective jurors based on race violates the federal and state Constitutions. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.) When examining allegations of such misconduct, there "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." (*Ibid*.) When a defendant claims a prosecutor has challenged a prospective juror based on an

14

impermissible ground, the following procedures apply: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168.)

Here, although the trial court did not expressly find defendant had established a prima facie case of discrimination, it proceeded to step two and elicited the prosecutor's reasons for the peremptory challenges. The trial court then found, under step three, that these reasons were valid. "Under these circumstances, we too may simply proceed as though this is a step three case, analyzing whether the trial court properly accepted the race-neutral reasons given by the prosecutor." (*People v. Mai* (2013) 57 Cal.4th 986, 1050.)

" 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 848.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court

15

need not question the prosecutor or make detailed findings." (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

Defendant asserts that the prosecutor's concern that H.B. lacked sensitivity, was factually oriented, and displayed little emotion "should be viewed as suspect because objectivity and reluctance to be easily swayed by appeals to emotion are generally considered characteristics of desirable jurors for the prosecution." Defendant also finds suspect the prosecutor's concern that H.B. was reluctant to look at objective factors of intoxication, contending that H.B. agreed with the prosecutor that there was a sliding scale with respect to a person's level of intoxication, and did not say he would be sympathetic to a person who committed a crime while using drugs. He asserts that H.B.'s comments about drugs "displayed an attitude favorable to the prosecution, rather than one justifying the use of a prosecution peremptory strike."

This argument miscasts the inquiry. The fact that the *objector* thinks his opponent should feel comfortable with the candidate is not the relevant question. The question is whether the advocate *exercising the challenge* had an honest and racially neutral reason for doing so. The trial court here found, as a matter of fact, that the prosecutor's reasons were honestly given and constitutionally valid. Not only do we defer to these factual findings, the prosecution's rationale stands to reason. Rigid jurors who appear emotionally detached and terse may be divisive during deliberations. They may not perform well as open-minded jurors willing and able to articulate their views and persuade others. The trial court expressly agreed with the prosecutor that H.B.'s responses seemed "very mechanical" and "very guarded." The prosecutor could reasonably conclude that H.B.'s nonrevealing responses might conceal views that would be unsympathetic to the prosecution's case. Substantial evidence supports the trial court's conclusion that the prosecutor did not challenge H.B. because of his race.

16

Defendant asserts that comparative juror analysis demonstrates that the prosecutor's reasons for challenging Prospective Juror H.B. were pretextual. (See generally *People v. Lenix* (2008) 44 Cal.4th 602, 622.) The argument fails.

Defendant notes the prosecutor's concern that H.B. had sat on a serious court martial that may have involved the death penalty but could not remember whether a capital sentence was imposed. Defendant contrasts this statement with the prosecutor's treatment of Juror G.H., who, defendant claims, "possessed an extensive legal background with respect to military courts martial," yet the prosecutor did not question her about the subject and allowed G.H. to serve on the jury. It is true that G.H. said she had been "a legal specialist in the Army." In response to questioning by defense counsel, however, she said she had merely "observe[d] some court martials," playing no active role in them. Some of the matters she observed were summary proceedings which involved "just doing paperwork basically." Thus, in contrast to Prospective Juror H.B., G.H. had not served on a court martial. The fact that the prosecutor did not explore this topic with her does not undermine the legitimacy of this stated reason for challenging H.B.

Defendant challenges the prosecutor's proffered reason that Prospective Juror H.B. did not have an opinion regarding psychology, which the prosecutor briefly mentioned in explaining the challenge. Defendant asserts that the trial court stated the prosecutor had explored the topic of psychology with H.B. "more extensively than [with] most jurors." Defendant claims this inquiry was in contrast to several non-Black jurors and an alternate of whom the prosecutor asked no similar questions, and that the "prosecutor's prolonged questioning of [H.B.] on psychiatry . . . represented an effort to uncover some pretext on which to dismiss" him.

17

Defendant cites no authority supporting this argument. Superficial or desultory questioning may indicate disinterest in an individual for any number of reasons. We are, however, aware of no case suggesting that genuine inquiry designed to understand a candidate's point of view provides grounds for suspicion. The trial court did note the prosecutor had questioned Prospective Juror H.B. "more extensively than most jurors." Contrary to defendant's representation, it did not say he had questioned H.B. more extensively than most jurors on the issue of psychology. H.B. did not answer the questionnaire's request for his "general opinions about psychology and psychiatry." The prosecutor reasonably asked follow-up questions to ascertain whether H.B. had any preconceived views on this topic. All of the seated jurors and the alternate cited by defendant responded to this part of the questionnaire.

Defendant notes that the prosecutor expressed concern that Prospective Juror H.B. suffered from a hearing impairment, but "apparently had no problems with . . . two nonblack alternate jurors who likewise suffered minor hearing impairments." He therefore concludes that "this purported basis for the prosecutor's strike of [H.B.] was likewise suspect." But the prosecutor merely mentioned H.B.'s hearing loss as a possible reason why H.B. appeared confused by questions, rather than as a basis for his challenge. The court confirmed that, for whatever reason, there was "some difficulty getting across."

As to Prospective Juror F.C., defendant contends that the prosecutor's mention that she twice used a harsh tone when correcting the clerk's mispronunciation of her name was "racially suspect" because it did not make her "more likely to disfavor the prosecution or favor the defense." But prosecutors must seek a unanimous verdict. They legitimately challenge a prospective juror whose behavior may indicate an inability to get along with other members of the

18

panel. Here, the prosecutor could plausibly conclude, based on F.C.'s chiding of the clerk, that she would not interact well with other jurors.

Defendant further contends that "nothing about [Prospective Juror F.C.'s] expressed attitudes and opinions regarding illegal drug use" made "her an undesirable juror for the prosecution." As the prosecutor noted, however, F.C. said she had difficulty using objective factors to determine when a person was intoxicated or under the influence of drugs even though she lived in an area where drug sales and use were common. She also said that drugs "make[] . . . people do things that they wouldn't ordinarily do." Given defendant's reliance on his drug use as a defense and a mitigating factor in this case, a prosecutor would legitimately be concerned about such views.

Defendant also contends that the prosecutor's stated concern about Prospective Juror F.C.'s large number of children and grandchildren was pretextual because other non-Black jurors and alternates had large numbers of children. But these candidates had families far smaller than F.C.'s Defendant therefore has not "exposed" the prosecutor's stated reason "as racially discriminatory."

Substantial evidence supports the trial court's determination that the prosecutor's reasons for challenging Prospective Jurors H.B. and F.C. were honestly stated and race neutral.

### 3. *Admission of defendant's statement*

Defendant contends the trial court erred in denying his motion to suppress his custodial statements.[7] We reject the claim.

---

[7] In this and certain other appellate claims defendant contends the asserted error infringed upon his constitutional rights. In those instances where he did not present constitutional theories below, "it appears that either (1) the appellate claim

*(Footnote continued on next page.)*

### a.  Factual background

Defendant was arrested on October 18, 1992.  He had in his possession a firearm and murder victim Gregory Renouf's identification.  As two officers took defendant across the street to the detective division, he pulled away and tried to escape.  All three fell.  Defendant suffered an abrasion to his forehead about an inch and a half in diameter.

Defendant was questioned that day on four occasions.  The interrogations were secretly videotaped.

Detective Keith Faust began the first session at 9:41 a.m.  Defendant waived his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436, 479) and denied knowing how he had come to possess the gun.  At 9:55 a.m., there was a 10-minute break.  Shortly after the session resumed, he requested counsel.  After a brief exchange (see *post*, pt. II.A.3.b.2.), Faust ended the interview.

Defendant was left in the interview room between 10:08 a.m. and 1:22 p.m.  He slept or rested for at least two hours and 15 minutes.  An officer checked on him twice:  once to ask if he wanted coffee or a bathroom break, and once again to inquire if he needed anything.  At 1:23 p.m., Detective Faust, Detective Larry Ferrari, and an evidence technician entered the room to photograph defendant's injuries.  Detective Faust asked, "Where did you get all this here, this red in

_____

*(Footnote continued from previous page.)*

is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution" (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7), and to that extent his new constitutional arguments are not forfeited on appeal (*ibid.*).  "No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here."  (*Ibid.*)

here?"**8** Defendant did not respond. Detective Faust asked, "Huh?" He continued to examine defendant's arm, and then asked, "Scratch here?"

Defendant subsequently asked, "When am I gunna . . . get to see a lawyer or get a phone call or something?" Faust replied, "Once you're booked into the county jail, you'll get that and you'll get your phone calls." Defendant asked, "All day huh?" Faust replied: "As soon as we get through here. Okay?" He told defendant to put his shirt back on, and then started to leave the room.

Defendant asked, "Can I talk to you for a minute?" Faust said, "Sure." Defendant asked, "Why are you guys trying to work me so hard, I told you I didn't do anything." Faust said: "Well, . . . unfortunately there was a man killed here in Sacramento and you have his checkbook, . . . you have casings in your car, you have a gun on you, . . . you have a check in his name. It's a payroll check. It's kind of hard to explain, you know?" Defendant said, "Hey well, hey — I understand." Faust asked, "[W]hy wouldn't we work you hard?" Defendant said, "I understand that but —" Faust said, "Put yourself in my position." Defendant said, "I know but —" Faust said: "*And I can't really talk to you because you want an attorney okay? You told me that earlier*." (Italics added.) Defendant said: "No, I just — all I said was you know, you can't put it all on me. Only cause you caught me you know what I mean?" Faust said, "Well that's what we've tried, we've tried —" Defendant interjected, "But what I see happen —" Faust continued, "*asking you, we was asking you questions this morning, but I can't talk to you because you want to talk to an attorney*." (Italics added.)

---

**8** The question can be heard on the videotape, but does not appear in the transcript of the statement. The trial court ruled that the question and the other comments about defendant's injuries would be suppressed, but counsel said the defense had no objection and did not want deletion of those comments.

21

Defendant said, "Well, you've gotta find Donzelle, Donzelle." Faust asked, "Was she with —" Defendant interjected, "I don't want to get myself in trouble, that's all." Faust said, "I understand that, I wouldn't want to get myself in trouble either. Okay? Is Donzelle well — *you wanna, you wanna talk or . . . you want an attorney*?" (Italics added.) Defendant said: "No, man. I, I didn't do any — I didn't fucken do shit! But fucken accept some fucken stuff you know?" Faust said, "Accept what?" Defendant said, "An i.d. and some checks."

Defendant then said he had "probably" gotten the identification and checks from either Donzelle or Kyle Mooney, who was with Donzelle. Defendant described Donzelle and Mooney, said where they lived, and explained why the three of them had traveled to Sacramento. Faust again sought to clarify whether defendant was waiving his previously invoked right to counsel, saying: "*I'm gunna have to you know, I want to talk to you, but I've got to clarify something . . . as long as, so I can understand okay, because I don't want to violate your rights. Do you understand where I'm coming from*?" (Italics added.) Defendant said, "Uh huh." Faust said: "Okay. *You had initially told me in my first interview with you that . . . you wanted an attorney. Okay, that you thought you were being set up, and you wanted an attorney*." (Italics added.) Defendant said, "Not by you[,] I —" Faust said, "Oh, no." Defendant said, "I mean Donzelle and her fucken buddy tried to set me up for what they did. I don't, I don't go for that!" Faust said, "Okay, so that's something we need to clarify too is that . . . [y]ou think that Donzelle and Mooney are setting you up?" Defendant said: "Well hell, he parked me out in front of the fucken police station! Hey, I didn't do nothing but steal my fucken father-in-law's car. That's all I did. I had possession of some stolen property." Faust asked, "*Well, can I continue to talk to you without an attorney*?" (Italics added.) Defendant said, "Yeah, I don't give a fuck! I'm going to jail anyway!"

22

The second interrogation continued, and defendant admitted to "knock[ing] [Shockley] down" and taking his wallet and car keys, receiving Renouf's checkbook, check cashing card, and driver's license, and burglarizing Renouf's home. He denied he was present at the time of Renouf's murder. The session ended at 1:49 p.m.

During the third session, which lasted from about 2:00 p.m. to about 3:30 p.m., Detectives Ferrari and Xavier Ordez interviewed defendant about Shockley's murder. Defendant said he had "slapped [Shockley] around, pushed him down," ransacked his home, and took a number of items, but that Shockley was alive when defendant left. He later said that after he had handcuffed Shockley, he, Donzelle, and Mooney put Shockley in his car and drove him to "the tul[]ies." As Shockley started to walk off into the field Mooney unexpectedly shot him in the head.

Defendant denied knowing the prostitute Stacy Copeland. During the interview Detective Ferrari asked if defendant needed a break for coffee or to use the restroom. Defendant asked for water and a cigarette. The water was provided, but a cigarette was not available because no one smoked. About 3:30 p.m., the interview ended, and defendant was fed.

About 3:40 p.m., defendant was assessed by nurse Linda Gravert. Gravert examined any arrestee who answered "yes" to any of a series of health questions on an intake form. Defendant had reported that he had ingested drugs, used alcohol, and had a head injury. According to Gravert's notes, defendant was alert and oriented, able to speak clearly, and walk without staggering. Defendant refused any treatment by Gravert and refused to answer questions about his health and drug history.

Gravert reviewed photographs of defendant's head injury taken before she saw him on October 18. In her view, the injury looked "superficial," but she

23

added that the injury would have to be cleaned off to see how deep it was. If an arrestee with that type of injury refused medical treatment, she would look at the injury but not touch the subject. An arrestee whose wound was "bleeding profusely" or was "laid wide open" would be sent to the medical center. Based on her training, Gravert concluded defendant was fit for incarceration and did not require emergency treatment. She referred him to the jail psychiatric service, "probably" because he said he used "different types of methamphetamine[], cocaine, marijuana and heroin," and because he was "reluctant" to discuss "his past history." Gravert learned that night that an employee in psychiatric services had recommended that defendant be "reevaluated[] for heroin detoxification."

During the fourth session, which lasted from 7:04 p.m. until about 9:05 p.m., defendant was interviewed by Detective Ferrari and by deputy district attorney (DDA) George Dunlap. Defendant was again read and waived his *Miranda* rights. He repeated many of the details he had previously given concerning the crimes against Shockley. He explained that he, Donzelle, and Mooney had driven Shockley to a remote area intending to leave him there and give themselves time to escape. About 9:05 p.m., as the interview was ending, defendant asked to speak privately with Dunlap. At the end of this eight-minute conversation, defendant confessed he had shot Shockley and had acted alone.

About 9:45 a.m. the following morning, Ferrari and Dunlap again spoke to defendant, and the session was videotaped. He confessed to the crimes against Shockley, Copeland, and Renouf, and admitted he had made up the existence of Donzelle and Mooney. That same day defendant directed officers to places where he had left items associated with his crimes. A few days later defendant was again interviewed by Detective Ferrari. After another *Miranda* admonition and waiver, he confessed to the ice cream store robbery, and further described his crimes against Shockley.

24

Defendant's motion to suppress his statements was denied.

### b. Analysis

"On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." (*People v. Davis* (2009) 46 Cal.4th 539, 586.)

### 1) Asserted improper dilution of the Miranda *warning*

After reading defendant his *Miranda* rights from a printed card, Detective Faust said: "Understanding those rights, . . . I want to talk to you about what you've been doing over the last couple of days. Can I talk to you about that?" Defendant said, "Yeah." Defendant points out that the question by Detective Faust differed from the question on the printed card, which said: "Having these rights in mind, do you wish to talk to us now?" Defendant contends that, by altering the question on the printed card, Detective Faust "improperly diluted" the *Miranda* warning given at the first interrogation. We disagree. After properly explaining defendant's constitutional rights, Faust asked if defendant wanted to speak with him. There was no *Miranda* violation. *Miranda* and its progeny have never mandated some sort of talismanic recitation. (*California v. Prysock* (1981) 453 U.S. 355, 359.)

### 2) Asserted Edwards *violations*

Defendant contends the trial court erred in admitting statements he made after he had invoked his right to counsel.

If after an admonition and waiver a defendant subsequently requests counsel, "the interrogation generally must cease until an attorney is present." (*People v. Dement* (2011) 53 Cal.4th 1, 26 (*Dement*). "Interrogation consists of words or actions on the part of the police that they should know are 'reasonably likely to

25

elicit an incriminating response.' [Citation.] However, if the defendant thereafter initiates a statement to police, 'nothing in the Fifth and Fourteenth Amendments . . . prohibit[s] the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.' [Citation.] Moreover, if the defendant's statement is not only voluntary, but constitutes a knowing and intelligent waiver of his right to see counsel, the interrogation may resume. [Citation.] Such a knowing and intelligent waiver is 'a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." ' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1034 (*Bradford*).) The state must demonstrate that the suspect knowingly and intelligently waived his right to counsel "under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." (*Edwards v. Arizona* (1981) 451 U.S. 477, 486, fn. 9 (*Edwards*).) As the court explained in *Bradford*, *supra*, at page 1036, the suspect's initiation of a conversation with officers, although not dispositive, "is strong and essential evidence of a knowing and intelligent waiver." "[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran* v. *Burbine* (1986) 475 U.S. 412, 421.)

Here, defendant invoked his right to counsel by saying: "I'm being set up, I want to see my lawyer!" Detective Faust then replied, "No, you're not being set up." Defendant said, "Um hum." Faust said, "Okay? We're not setting you up." Defendant said, "No, I didn't say you were." Faust said, "Oh, okay." Faust then ended the interview. Defendant asserts that Detective Faust, by these comments, interrogated defendant immediately after he invoked his right to counsel, in violation of *Edwards*, *supra*, 451 U.S. 477. No interrogation occurred.

26

"[N]ot all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response." (*People v. Clark* (1993) 5 Cal.4th 950, 985.) Here, although the brief exchange concerning defendant's statement that he was being set up happened after he had invoked his right to counsel, the detective's statements were not reasonably likely to, nor did they, elicit an incriminating response. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301.)

After defendant invoked his right to counsel the interrogation ended. He was offered coffee and use of the restroom, and asked if he needed anything else. He was otherwise left undisturbed. Several hours later, Detective Faust and a technician returned and photographed his injuries. Defendant challenges Faust's later questions during that encounter: "Where did you get all this here, this red in here?" and "[s]cratch here?" The trial court ruled that these questions should be suppressed, but defense counsel said, "I'm not objecting to it," and "I don't want it to be deleted," thereby waiving defendant's right to challenge the admission of these questions on appeal. Even if that challenge had not been waived, and further assuming for the sake of argument that the questions constituted interrogation, defendant was not prejudiced. He gave no response. (*Dement*, *supra*, 53 Cal.4th at p. 28.)

As Detective Faust was leaving defendant asked, "Can I talk to you for a minute?" He thus reinitiated the interrogation. During the ensuing conversation, Faust repeatedly sought to confirm that defendant understood he did not have to speak but was nonetheless choosing to do so. (See *ante*, pp. 21-22.) Finally Faust asked, "Well, can I continue to talk to you without an attorney?" Defendant said, "Yeah, I don't give a fuck! I'm going to jail anyway!" Defendant had initially received *Miranda* warnings and waived his Fifth Amendment rights. After his

27

later request for counsel, the interrogation ended as required. He then reinitiated the interrogation, and was repeatedly reminded he did not have to talk to Faust. The trial court's ruling that he made a knowing and intelligent waiver is supported by substantial evidence. (See *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1046 [no *Edwards* violation occurred when the officer "immediately reminded the accused that '[y]ou do not have to talk to me,' and only after the accused told him he 'understood' did they have a generalized conversation"].)

Detective Faust did briefly discuss other topics with defendant between defendant's reinitiation and his waiver. Even assuming the trial court should have suppressed this discussion, defendant only admitted to stealing murder victim Shockley's car and receiving an "i.d. and some checks." The evidence at trial independently demonstrated defendant was carrying murder victim Renouf's driver's license, check cashing card, paycheck, and checkbook. He cannot demonstrate prejudice in admission of his statements to that effect.

### 3) *Voluntariness of the statement*

Defendant contends that his October 18, 1992, statement was involuntary because the interrogating officers made false representations of leniency, deceived him, took advantage of his weakened condition, and "relentless[ly]" interrogated him "to pressure [him] to confess to the various crimes." The record fails to support these assertions. Moreover, other than noting he was interrogated for two hours on October 19, he makes no claim that any of the asserted circumstances on October 18 tainted his full confession to his crimes against Shockley, Renouf, and Copeland the following day, or his confession to the ice cream store robbery made a few days later.

28

The state must demonstrate the voluntariness of a confession by a preponderance of the evidence. (*People v. Massie* (1998) 19 Cal.4th 550, 576.) "To determine whether a statement was voluntary or coerced, we examine the totality of the circumstances. [Citation.] Coercive police activity is a necessary predicate but does not itself compel a finding that a resulting confession is involuntary. [Citation.] . . . The Fifth Amendment is not 'concerned with moral and psychological pressures to confess emanating from sources other than official coercion.' " (*Bradford*, *supra*, 14 Cal.4th at p. 1041.)

*a)   Asserted false representations of leniency*

Defendant contends that Detective Ferrari "falsely indicated that [defendant] would receive leniency if he confessed to police." He relies on Ferrari's statement to him at the beginning of the 2:00 p.m. interview on October 18, 1992: "There are two sides to every story, okay? And we're real anxious to get your side of what happened okay?" He also relies on Ferrari's statements at the beginning of the interview that same evening: "Remember we talked about the importance of . . . there being two sides to a story o.k. And that if you weren't entirely involved in this situation, that[] it's important that we hear from you . . . your version of what happened."

Defendant contends that Detective Ferrari's statement that there are two sides to every story was a "promise of benefit or leniency" that rendered defendant's subsequent statement involuntary. Not so. Ferrari's statements simply indicated a willingness to listen to defendant and encouraged him to tell what happened.

Moreover, it is apparent defendant did not interpret Ferrari's statements as promises of benefit or leniency. At the end of the afternoon interrogation, defendant said the detectives had made no promises or threats during their

29

conversation. The following morning he repeated that no promises had been made to him during the two days of interrogation.

### b) Asserted deception

Defendant contends his statement was "tainted by deception" because Detective Faust misinformed him about when he could use the telephone, and about whether he would be able to talk to the police after invoking his right to counsel. Even if deceptive comments are made, their use "does not necessarily render a statement involuntary. Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is ' " 'of a type reasonably likely to procure an untrue statement.' " ' " (*People v. Williams* (2010) 49 Cal.4th 405, 443.)

Section 851.5, subdivision (a) provides in part, "[i]mmediately upon being booked, and, except where physically impossible, no later than three hours after arrest, an arrested person has the right to make at least three completed telephone calls." Section 851.5 further provides that "[t]hese telephone calls shall be given immediately upon request, or as soon as practicable." (§ 851.5, former subd. (c), now subd. (e).) About 1:30 p.m. on October 18, more than three hours after his arrest, defendant asked, "When am I gunna . . . get to see a lawyer or get a phone call or something?" Faust replied, "Once you're booked into the county jail, you'll get that and you'll get your phone calls." Defendant said, "All day huh?" Faust replied: "As soon as we get through here. Okay?" Faust started to leave the room, and defendant said, "Can I talk to you for a minute?"

This exchange conveyed that defendant was about to be booked, and would soon be able to make telephone calls. Thereafter, he reinitiated the interrogation. Thus, it is not clear how Faust's statement was likely to result in an untrue statement, or how, as defendant further claims, this statement in combination with

30

the asserted "unjustified delay in booking" frustrated defendant's "ability to effectuate his invocation of his right to counsel by obtaining an attorney."

Defendant also contends that Detective Faust deceived him by saying that if he invoked his right to counsel he would not be permitted to speak with officers even if wanted to do so. He relies on statements by Faust, italicized above, that attempted to clarify whether defendant was waiving his right to counsel. (See *ante*, pp. 21-22.) Defendant repeatedly interrupted Faust, but ultimately confirmed that he was reinitiating the interrogation and waiving his right to counsel. Faust asked additional questions during which defendant would continue to ramble and interrupt. In response, Faust said, "I'm gunna ask some questions, you gotta . . . respond to them." Nothing in these statements falsely informed defendant that if he exercised his right to counsel he could never speak with the officers again. Nor, taken in context, do they undermine defendant's right to terminate questioning if he so desired.

### c) Defendant's asserted condition

Defendant contends that the "combination of [his] drug-impaired, sleep-deprived and medically-weakened condition weighs heavily in favor of a finding that [his] statements to the officers were involuntary." To the contrary, review of defendant's October 18 statement indicates that he understood the questions asked and answered responsively. It does not indicate that defendant was so drug impaired, sleep deprived, or medically weakened that he did not freely and deliberately choose to speak with law enforcement officials. Moreover, "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." (*Colorado v. Connelly* (1986) 479 U.S. 157, 165.) Rather, "coercive police activity is a necessary predicate to the finding that a

31

confession is not 'voluntary.' " (*Id*. at p. 167.) In the absence of evidence of coercion, "we cannot conclude that defendant's statement was involuntary solely because of any alleged physical or mental condition." (*Bradford*, *supra*, 14 Cal.4th at p. 1045.)

Relying on evidence introduced at the second penalty phase, defendant asserts that a "blood sample taken shortly following [his] arrest showed a high level of methamphetamine in his system." Defense counsel introduced no such evidence at the suppression hearing, explaining that he was concerned that the test was not performed until 11 months after the blood was drawn. The trial court did not consider the blood test evidence in ruling on the motion; we do not consider it now. (*People v. Rundle* (2008) 43 Cal.4th 76, 132 (*Rundle*).) Defendant reported he "got high" at times over the weekend, yet his memory of the preceding two days was detailed and his answers to questions responsive. He had the presence of mind to make up two confederates and try to foist blame onto them. Unlike *In re Cameron* (1968) 68 Cal.2d 487, on which defendant relies, defendant did not demonstrate his earlier drug use resulted in a " 'drug-induced lobotomy' " before his statement. (*Id*. at p. 500, fn. 6.)

Although defendant demonstrated some fatigue in the initial interview before he invoked his right to counsel, his responses were coherent and responsive. He spelled his name, gave his age and date of birth, and relayed Shockley's street address. Moreover, other than mentioning his illegal drug use, defendant made no incriminating statements during this interview. Defendant then rested for two to three hours before the second session. There was a more than three-hour break before the fourth interview.

Although defendant's forehead was scraped when he attempted to avoid arrest, he refused the offer of medical treatment. The attending nurse did not deem his injury significant enough to compel medical treatment over his objection.

Defendant asserts that he was not "offered any food until 3:32 p.m." on the day of his arrest. Detective Faust testified that defendant was asked if he was "okay" and needed "anything" between the morning and afternoon interviews. He made no requests.

### d) Failure to readvise

Defendant contends that the "fact that [he] was not provided with a second *Miranda* admonition until" his evening interview with Detective Ferrari and DDA Dunlap is "a factor weighing against the voluntariness of his ultimate confession." To the contrary, readvisement of defendant's *Miranda* rights was not required before his afternoon interview with Detectives Ferrari and Ordez. " '[R]eadvisement is unnecessary where the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights.' " (*People v. Pearson* (2012) 53 Cal.4th 306, 316-317.)

Here, defendant was read and waived his *Miranda* rights before the first interview. Shortly thereafter he invoked his right to counsel, clearly indicating his understanding. Defendant reinitiated the interrogation, and made a knowing and intelligent waiver of his right to counsel, before the second interview. Less than half an hour later, he spoke with Ferrari and Ordez. The location of the interrogation was the same, and defendant was well-familiar with the criminal justice system. Based on the first interrogation, he knew any questioning would end if he asked to speak to an attorney. Under these circumstances, readvisement

33

of his *Miranda* rights was not required. Indeed, defendant does not explain how the failure to readvise him until the beginning of the evening interview led to his later confession that he alone shot Shockley.

### e) Asserted relentless interrogation

Defendant asserts that his statements on October 18 were the product of "illicitly coercive and relentless interrogation." Not so. Although defendant was interrogated for a total of four to five hours on October 18, the interrogations were not continuous. (See *Rundle*, *supra*, 43 Cal.4th at p. 123 [the defendant was not subjected to a single long interview, but to a "series of relatively short interviews by various officers about different crimes, often with significant breaks in between"].) Nor does the record reflect that by leaving defendant alone in the interrogation room for three hours, Detective Faust acted "in clear disregard of [his] physical needs, particularly his desperate need for sleep," as defendant claims. In fact, defendant did sleep or rest for at least two hours during this time, and was asked if he was all right or needed anything. "These circumstances hardly reflect the kind of continuous, prolonged interrogation that has been found to render a resulting confession involuntary." (*People v. Linton* (2013) 56 Cal.4th 1146, 1178.)

Defendant contends that during the fourth session on October 18, he cried and begged to be allowed to sleep while DDA Dunlap "hammer[ed] away at him to get him to admit that he shot Copeland and killed Shockley and Renouf," conveying the message that "the interrogation would not cease until [defendant] conformed his story to what [Dunlap] wanted to hear." His colorful characterization is simply not borne out by the record. As the interview with Ferrari and Dunlap was ending and they were leaving the room, *defendant* asked to speak alone with Dunlap. An eight-minute conversation ensued. Defendant

told Dunlap he had "not exactly" been truthful with him, and asked Dunlap if he could offer a plea bargain by which defendant would be assured of the death penalty. Dunlap said he did not believe he could make such an offer, and asked if defendant wanted to tell him the truth. Defendant said he wanted to go to sleep, and couldn't "think straight." Dunlap reminded defendant that *he* had asked to speak with Dunlap, and encouraged him to do so. Defendant said he did not want to be "stuck in jail forever." He then denied responsibility for killing Shockley and Renouf, and shooting Copeland.

Dunlap asked what defendant had been untruthful about. Defendant expressed concern about previous cases that had been "dragged out" even though the defendant had admitted responsibility. Dunlap reminded defendant that he had said he "didn't do it," and that it was his request to talk. Defendant said, "I want a bed and I want a cigarette and I want some sleep and [if] I can get those, then I will tell you everything." Dunlap offered to come back the following morning after breakfast, and asked defendant if he could have a brief synopsis of what defendant wanted to say so that he would know if it was worth the drive "all the way back up here." Defendant said: "I shot Larry. I sh, I shot Larry." Dunlap asked if he acted alone, and defendant admitted he did. This portion of the interview was brief. Nothing in the exchange can reasonably be characterized as relentless or coercive.

In sum, as the trial court concluded, defendant's *Miranda* warnings were not improperly diluted, he made a knowing and intelligent waiver of his right to counsel, and his confession was voluntary.

### B. Guilt Phase Issues

#### 1. *Asserted instructional error*

Defendant contends that the trial court's instruction in the language of CALJIC No. 2.15 unconstitutionally reduced the prosecutor's burden of proof.[9] "CALJIC No. 2.15 addresses the inference that may be drawn . . . when a defendant is found in conscious possession of recently stolen property," and "is properly given in cases in which the defendant's intent to steal is contested." (*People v. Parson* (2008) 44 Cal.4th 332, 355 (*Parson*).)

Here, defendant had Shockley's car, was carrying Renouf's identification and other documents, had previously cashed Renouf's checks, and had tried to cash one of Shockley's. These circumstances supported the instruction. The instruction neither creates a mandatory presumption, or shifts the burden of proof to the defense. "[T]he instruction merely permits, but clearly does not require, the jury to draw the inference described therein. [Citation.] Perhaps more to the point, there is nothing in the instruction that directly or indirectly addresses the burden of proof, and nothing in it relieves the prosecution of its burden to establish guilt beyond a reasonable doubt." (*Parson*, *supra*, 44 Cal.4th at pp. 355-356.)

---

[9] The trial court instructed the jury: "If you find that a defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of robbery or burglary. Before guilt may be inferred there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt. As corroboration you may consider the attributes of possession, time, place and manner[,] that the defendant had an opportunity to commit the crime charged, the defendant's conduct, his false or contradict[ory] statements, if any, and/or other statements he may have made with reference to the property, a false account of how he acquired possession of the stolen property, [or] any other evidence which tends to connect the defendant with the crime charged."

36

### 2. *Asserted cumulative error*

Defendant contends that even if the asserted errors before and during the guilt phase are not individually prejudicial, they cumulatively are so prejudicial they require reversal. We have found no error. Even where we have assumed error we have found no prejudice. Thus, there was no prejudicial error to accumulate.

### C. Penalty Phase Issues

### 1. *Asserted juror misconduct*

Defendant is, however, entitled to a retrial of the penalty phase. Juror Y.M. (Y.M.) committed prejudicial misconduct when he consulted his pastor during penalty deliberations.

### a. *Factual background*

Before those penalty phase deliberations began, the court told the jury: "[Y]ou, as jurors, must decide the facts of the case based solely on the evidence presented to you at the trial . . . and not from any other source. You must not make any independent investigation of the facts or the law, or consider or discuss facts as to which there is no evidence. Furthermore, you must not . . . consult reference works or persons for additional information. *You must not discuss this case with any other person except a fellow juror . . . .*" (Italics added.)

During deliberations on May 17, 1995, the trial court received the following note: "The Jury needs clarification on the final instructions regarding Mercy & Empathy as how to vote either for life without parole or death.[10] [¶] Also

---

**10** The "final instructions" apparently referred to the language of CALJIC No. 8.88 that appeared on the last two pages of the instructions and read:

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant, Paul Loyde Hensley. [¶] After having heard all of the

*(Footnote continued on next page.)*

[e]xplain P. 22 4th paragraph & 1st paragraph P. 23[.]  Also P. 36

Paragraph 4[.]"[11]  The court and counsel discussed the note.

*(Footnote continued from previous page.)*

evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶]  An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.  [¶]  A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.  Mitigating circumstances include any sympathetic or other aspect of defendant's character or record that the defendant offers as a basis for a sentence less than death.  [¶]  The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them.  You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.  In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.  To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

[11]  The referenced page numbers do not correspond to the written instructions in the record.  There is no fourth paragraph on page 22, nor is there a page 36.  It may be that these same instructions were given to the jury in a different format.  From the discussions between court and counsel, it appears the following instruction is pertinent:  "Remember that the determination of factual issues in this trial must be made without regard to passion, pity, sympathy or prejudice towards any party, attorney or person.  However, in the selection of the ultimate penalty in this case you may consider sympathy and pity in making that decision.  [¶]  That is, in this penalty trial the law permits you, if you so choose, to be influenced by mercy, sympathy, compassion or pity for the defendant or his family in arriving at a proper penalty in this case.  Also, you may, if you so choose consider mercy, sympathy, compassion or pity for either of the two murder victims

*(Footnote continued on next page.)*

With the jury in the courtroom, the trial court asked whether the note concerned "a problem that all jurors [were] having, or just certain jurors?" The foreperson replied, "No, just certain jurors." The court asked her to clarify the request without revealing who was making it. She replied: "[W]e need it . . . clear on — on how to come to a . . . conclusion of which penalty to choose," and added that the jury needed clarification on "what the rules are on . . . the mitigating evidence and the aggravating evidence, how we are supposed to weigh those and come to a conclusion." She explained: "We are not sure. The way we read the paper, it seems there [are] several different places in there that they — it almost contradicts itself." The court asked if the foreperson understood the difference between deciding what facts had been proven as opposed to deciding what penalty is appropriate in light of those facts. The foreperson said, "No." The court said it would adjourn for the night, and give further instructions the following day.

The next morning, the trial court told the jury it would be sent out for further deliberations. The court said it would consult with counsel before giving further instructions. The foreperson said: "The matter's been solved. We don't need clarification now." The court said: "It's up to you. If you don't think the matter is now confusing or . . . contradictory." The foreperson said: "I have been advised it isn't. I'm just going on what I have been told." The court sent the jury out to continue deliberations. Less than half an hour later, the jury sent a note announcing it had reached a verdict. The death verdict was read, and the jury polled. The court did not record the verdict but excused the jury, directing it to

_____

*(Footnote continued from previous page.)*

in this case or members of their families in arriving at a proper penalty in this case."

39

return that afternoon for further questioning. The court told counsel it was concerned that deliberations had occurred outside the jury room, and believed that investigation was warranted before the verdict was entered.

At the afternoon session, the trial court and counsel privately questioned the foreperson. She explained the question raised the day before was only for Y.M. She explained that "[t]his morning, [Y.M.] met me outside of the courthouse," and told her to "[w]ithdraw the question," adding: "I have answered it for myself. I have worked it through and answered it." Thereafter she told the court clarification was unnecessary.

The court and counsel then interviewed Y.M. He affirmed he told the foreperson "it wasn't necessary for us to go forward with my request as of yesterday, because I had talked to . . . my pastor about . . . mercy and sympathy." Y.M. added he had not spoken to his pastor "about the trial." Asked to describe the conversation, Y.M. said: "I asked him about . . . responsibilities as a citizen, and believing in mercy and grace. And he . . . quoted to me if you render the things that . . . are of Caesar, which is the law of the land, and render the things which are God to God, and he said that we have a duty — when you have a job as a police officer or as a citizen, when you are chosen to be a part, if . . . a police officer, if that's your job, and you have to kill someone . . . in the duties of your job, then . . . that is your job. Or if you are on a jury, that you have to go with the law of the land. And that's when he told me about . . . render the things which are Caesar to Caesar, and the things which are God to God. And he said something about the double-edged sword. If you live by the sword, you die by the sword. . . . That was basically the things that he said."

The trial court asked, "Did you discuss any of the facts of the case with him?" Y.M. replied, "No, I did not . . . because I knew I couldn't discuss anything." In response to the court's inquiry, Y.M. said he had called his pastor,

40

and agreed with the court that he had done so for "spiritual advice." The court asked, "[Y]ou told him you were troubled about something regarding this trial?" Y.M. replied, "Yes." The court asked, "And about the use of mercy, sympathy, and that *in terms of making a decision* — [¶] [¶] . . . *on the penalty*?" Y.M. said, "Yes." (Italics added.)

The trial court asked Y.M., "[W]hat exactly were your words to him, in terms of what you were asking him to tell you?" Y.M. answered: "I just said in . . . a life and death case — where do we stand as a believer in God? . . . I said where should a person stand when you believe in mercy, sympathy, pity, in making your judgment on — because I was having — I was going back and forth in whether or not it should be —" (Underlining added.)[12] The court interjected, "Oh, I don't want to go into your individual thinking process." Y.M. said: "I didn't say anything to him about that. I just said where should a Christian stand, because as I was reading . . . portions of . . . the instructions, I was having some thought about . . . which way I should go. So I just asked him about the mercy and the . . . pity and the . . . sympathy. And he just told me some things that I've already said about —" The court asked, "Did you perceive his answers [as] telling you not to use those factors?" Y.M. replied, "No, I didn't." The court asked, "So . . . he

_____

**12** "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).) The underlined portions of Y.M.'s testimony appear to "relate solely to the mental processes and subjective reasoning" of the juror and hence are not considered in resolving this question. (*People v. Danks* (2004) 32 Cal.4th 269, 298, fn. 9 (*Danks*).) We include them, however, in the interest of completeness.

41

didn't tell you not to use mercy, sympathy and concern in making a decision?" The juror replied: "No, he didn't tell me which way to go, no. He just told me just render the things, the law of the land, you know. *Either I can go with the law of the land or I can go with mercy, sympathy and grace*." The court asked, "He didn't tell you which way to go?" Y.M. replied: "No. I already knew that the decision was mine." (Italics added.)

The court and counsel discussed Y.M.'s statements, then called him back for additional colloquy. Y.M. related that he had known his pastor for two years. The court asked, "[D]o you feel the consultation you had with him helped you in resolving the issues that you were facing?" Y.M. replied, "So far as making my final decision, yes." The court asked: "[H]ow did this clear up the ambiguity in the instructions, if indeed you had such a problem with the instructions? [¶] [¶] In other words, did he tell you something that cleared up . . . what you perceived as being ambiguous in the instructions?" The juror replied: "Well, in the instructions, it said that we . . . wasn't supposed to consider, if I remember correctly, sympathy, pity and . . . mercy. Then . . . again, it told us that we could consider it. It said two different things. And . . . just about two different paragraphs."

The trial court asked: "[D]id something the minister tell you that helped you . . . [¶] [¶] . . . clear up the ambiguity? Why didn't you think the Court ought to give you an instruction clearing it up today? In other words, you told [the foreperson] not to ask for the instruction." Y.M. replied that he had asked for instruction yesterday, and added: "And then I asked him this morning. And it just cleared it up. It made it a little bit more plainer to me when . . . he just said that the law of the land or of God. . . . [T]hat just cleared it up to me." The court said, "Okay." Y.M. said: "Because I was . . . changing my mind, going both ways. But when he said that . . . you go with the law of the land or —" The court

42

interjected, "As opposed to what?" Y.M. continued: "[O]r render the things which are Caesar's, <u>which to me means, you know, the law of the land and the things of God, the things of God. And, to me, . . . that just cleared it up, so far as — it just helped me make my decision more clearly</u>."

Once Y.M. returned to the jury room, defendant objected to the entry of the verdict. He also objected to the trial court's suggestion that Y.M. be excused for misconduct and an alternate juror seated. Counsel argued that the quality of the deliberations would not be "what the law contemplates" because a verdict had already been reached. After further discussion, the court released the jury for the day. It told the jurors to follow the standard admonitions and return the following Monday.

Defendant moved for a mistrial, and the trial court heard argument on the issues of juror misconduct and the propriety of substituting a juror after a verdict was read and affirmed but before it was entered. The following Monday, the mistrial motion was denied. The court ruled Y.M. had not committed misconduct, but even if he had, defendant was not prejudiced. The jury verdict was entered and the jury was discharged.

Defendant filed a new trial motion asserting juror misconduct. A hearing on the motion was held about four months after the penalty verdict. Reverend Bernard Sutton, Y.M.'s pastor, testified as follows. Y.M. had been a member of Reverend Sutton's church for three years, and served as a deacon. On May 17, 1995, Y.M called him at home about 7:30 p.m., and the two spoke for about 20 minutes.

Y.M. asked Reverend Sutton "what the Bible said about the beliefs of a Christian concerning the death penalty," and Reverend Sutton "simply answered what the Bible said about it." During their conversation, Reverend Sutton asked Y.M. to get his copy of the Bible, and shared with him the passage in Matthew

43

about "render[ing] unto Caesar the things that are Caesar's."  He did so because Y.M. "was dealing with matters of the laws of the land. . . .  [¶]  [¶]  I told him he had an obligation to obey the laws of the land."  Reverend Sutton was not "familiar with the exact laws that [Y.M.] ha[d] been instructed on as to what the death penalty involve[d]," nor did Y.M. describe "what the different choices in the laws were."

Reverend Sutton also mentioned the biblical passage that if "you live by the sword, you also die by the sword."[13]  He did so because Y.M. "mentioned about the death penalty, where would we stand as far as believers with the death penalty. And I shared with him that the Bible did say that if you lived by the sword, you will die by the sword.  [¶]  [¶]  That was simply the nature of our conversation." Reverend Sutton did not explain this passage to Y.M. because "I didn't have to explain it to him."  He testified that the "passage means that if you are responsible for taking someone's life and . . . you are found guilty of it, then you also are responsible — or the laws of the land are responsible to tak[e] yours."  Asked if the passage supported the death penalty, Reverend Sutton said, "In my view[], it does."  He did not tell Y.M. "that he had a duty to impose the death penalty," or share his "personal opinion about [his] views of the death penalty."  Reverend Sutton told Y.M. that "he would have to basically vote his own opinion about whatever took place."

_____

**13** It is not clear which translation of the Bible Reverend Sutton and Y.M. were reading, but similar language appears in Matthew chapter 26, verse 52.  (See King James Version ["Then said Jesus unto him, Put up again thy sword into his place; for all they that take the sword shall perish with the sword"]; New Revised Standard Version (1989) ["Then Jesus said to him, 'Put your sword back into its place; for all who take the sword will perish by the sword.' "]; New International Reader's Version (1996) [" 'Put your sword back in its place,' Jesus said to him. 'All who use the sword will die by the sword.' "].)

44

Asked, "Did the topic of mercy, sympathy, compassion, come up during the conversation," Reverend Sutton said, "No, none whatsoever." He did not recall Y.M. saying the words "mercy" or "sympathy," or speaking about these topics himself, but said he did not remember everything said during the conversation. After reading Y.M.'s previous testimony, Reverend Sutton said he could have told Y.M. he had a choice between going with the law of the land or with mercy, sympathy, and grace, but he did not recall doing so. He did recall telling Y.M. that "if he had a job as a police officer . . . and . . . it cause[d] . . . him to take someone's life in the line of duty, that he would be rendering unto Caesar the things which were Caesar['s]."

Asked if, in his view, "there is no room for Christian mercy in the law," Reverend Sutton answered, "[T]here's total separation between the law and beliefs of Christians." In response to defense counsel's question, Reverend Sutton said there are no passages in the Bible that question the advisability of carrying out the death penalty.

Y.M. had solicited advice from Reverend Sutton on other occasions, but the two had never previously spoken about the death penalty. Reverend Sutton did not know Y.M. was on a jury until the night that he called. Y.M. did not say it was a death penalty trial but simply asked what the "Bible said about the death penalty." Reverend Sutton "[o]f course" had the impression Y.M. was dealing with a murder case because of their conversation, but did not recall him specifically saying that. Y.M. did not mention defendant's name, and the two did not "discuss the trial at all."

Before the conversation ended, Y.M. and Reverend Sutton prayed "about what [they] had discussed" and asked "the Lord [to] give [Y.M.] the wisdom to make his decisions." Reverend Sutton described Y.M.'s emotions during the conversation: "He was very troubled. He was troubled to the point of — of even

45

the fact that of him calling me about it.  I could . . . tell that he was disturbed about it, that it was really weighing heavy on his mind."  After the prayer, "he seemed to be just a little more at ease about our conversation."

The court denied the new trial motion, stating:  "[T]he [c]ourt believes that he was struggling with whether or not to impose the death penalty, whether a Christian could ever vote for [the] death penalty in asking a pastor, and was told there are places in the Bible that make it possible for a Christian to do that.  He has to follow the law.  The law allows for consideration of sympathy and mercy.  And he followed the law and he made the decision.  The decision was his."

### b.  Analysis

"An accused has a constitutional right to a trial by an impartial jury. [Citations.]  An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]."  (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

In assessing these claims, we first determine whether misconduct actually occurred.  (*Danks*, *supra*, 32 Cal.4th at p. 302.)  Misconduct "raises a presumption of prejudice '[which] the prosecution must rebut . . . by demonstrating "there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment." ' "  (*In re Boyette* (2013) 56 Cal.4th 866, 892 (*Boyette* ).)  "If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard."  (*People v. Nesler* (1997) 16 Cal.4th 561, 579 (lead opn. of George, C. J.).)

46

Regardless of how weighty the evidence may be, a defendant is entitled to 12, not 11, impartial jurors. (*In re Carpenter* (1995) 9 Cal.4th 634, 652, 654.)

" 'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.' [Citation.] However, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*Danks*, *supra*, 32 Cal.4th at pp. 303-304.)

Here, as the Attorney General concedes, Juror Y.M. committed misconduct. Although instructed not to discuss the case except during deliberations, Y.M. called his pastor for spiritual advice on the use of mercy and sympathy in making a decision on penalty, the very decision under deliberation. He thus " 'deliberately set out to [discuss] . . . the issues at the trial.' " (*Boyette*, *supra*, 56 Cal.4th at p. 892; see *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 55; *Danks*, *supra*, 32 Cal.4th at p. 309.) A juror's misconduct "raises a presumption of prejudice '[which] the prosecution must rebut . . . by demonstrating "there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment." ' " (*Boyette*, at p. 892.)

Excluding evidence that was inadmissible under Evidence Code section 1150, subdivision (a), there remains a substantial likelihood that Y.M. was actually biased by his conversation with Sutton.[14]

---

[14] Of course we know that Y.M. was influenced by his conversation with Reverend Sutton because Juror Y.M. said he was. Under Evidence Code section 1150, subdivision (a), however, we cannot and do not consider Juror Y.M.'s statements that when he spoke to Reverend Sutton "it just cleared it up. It made it a little bit more plainer to me when . . . he just said that the law of the land or of God. . . . [T]hat just cleared it up to me. . . . [¶] [¶] Because I was . . . changing my mind, going both ways. But when he said that . . . you go with the law of the land or — [¶] [¶] . . . . or render the things which are Caesar's,

*(Footnote continued on next page.)*

During the penalty deliberations, Y.M asked the foreperson to seek guidance on how to reconcile instructions that Y.M. viewed as conflicting.  Before the court responded, Y.M. initiated a conversation with his pastor Reverend Sutton.  The circumstance that Y.M. *solicited* Reverend Sutton's guidance is significant in determining whether there is a substantial likelihood that Y.M. was actually influenced by it.  (Cf. *Danks*, *supra*, 32 Cal.4th at p. 310.)

Y.M. and Reverend Sutton spoke at length about the topic of mercy and the death penalty.  Although Y.M. did not tell Reverend Sutton he was serving on a death penalty jury, he asked Reverend Sutton what the "Bible said about the death penalty," and told Reverend Sutton that he was "troubled" "about the use of mercy, sympathy, . . . in terms of making a decision — [¶]  [¶] . . . on the penalty." Reverend Sutton did not expressly tell Y.M. how to decide the question of penalty. He did note the biblical admonition that "*if you lived by the sword, you will die by the sword*."  (Italics added.)  He told Y.M, "[I]f you are on a jury, that you have to go with the law of the land."  Reverend Sutton reminded Y.M. of the obligation to render unto Caesar those things that are Caesar's**,** and said Y.M. could "[*e*]*ither go with the law of the land or go with mercy, sympathy and grace*."  (Italics added.) This advice indicates, falsely, that the "law of the land" does not permit a juror to consider mercy in determining whether to vote for a death verdict.  The law of California is otherwise.  (See § 190.3, factor (k); *People v. Myles* (2012) 53 Cal.4th 1181, 1218-1219.)  Indeed the jury was instructed that it could "be influenced by mercy, sympathy, compassion or pity for the defendant . . . in

---

*(Footnote continued from previous page.)*

which to me means, you know, the law of the land and the things of God . . . . And, to me, . . . that just cleared it up, so far as — it just helped me make my decision more clearly."

arriving at a proper penalty in this case," and to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

We recognize that because the " 'sentencing function is inherently moral and normative, not factual' " (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79), "it is to be expected and is not misconduct that 'jurors . . . consider their religious beliefs during penalty deliberations' " (*Danks*, *supra*, 32 Cal.4th at pp. 308-309). But here, Y.M. did not simply read the Bible or draw on his own religious beliefs or personal values. Rather, contrary to the trial court's instructions, he actively sought the spiritual advice of his pastor on the very issue he was deciding as a juror and was advised in a manner inconsistent with the court's instructions.

After speaking with Reverend Sutton, Y.M. told the foreperson that his question about perceived inconsistencies in the instructions had been resolved. There is no evidence that Y.M. shared his conversation with Reverend Sutton with the other jurors**.** This circumstance, however, does little to negate an inference of bias on Y.M.'s part. The jury, which had previously deliberated for a day and a half, returned a death verdict less than half an hour after deliberations resumed.

Contrary to the Attorney General's assertion, Y.M. did not merely ask Reverend Sutton "whether imposing the death penalty would be inconsistent with his Christian beliefs," nor, as the Attorney General further asserts, did Reverend Sutton limit his remarks to telling Y.M. "that he had an obligation to follow man['] s law" and "show[ing] him that the Bible did indeed demonstrate that one could be a good Christian and impose the death penalty." Rather, the record is more fairly read as revealing Reverend Sutton told Y.M. that mercy, sympathy, and grace are inconsistent with the "law of the land," that persons who kill must

49

themselves be killed, and that just as a police officer has to kill in the line of duty, a juror must "go with the law of the land."

At oral argument, the Attorney General asserted that the misconduct here was less egregious than that in *Danks*, *supra*, 32 Cal.4th 269. We disagree.

In *Danks*, Juror K.A. (K.A.) told her husband she was feeling stress over making the penalty decision. She did not, however, discuss with him the case or the deliberations. (*Danks*, *supra*, 32 Cal.4th at p. 300.) Her husband gave her a Bible passage to read. (*Ibid*.) Later at church, K.A. and her husband encountered their pastor, and K.A.'s husband suggested she talk with their pastor about the Bible verses she had read. K.A. said that she " 'did not need to discuss anything.' " (*Ibid*.) The pastor said he understood that K.A. had read several scripture verses. She said she had read the scriptures and " 'they gave [her] comfort.' " (*Ibid*.) The pastor, who knew that K.A. was a juror on the Danks case, said those were good scriptures and also said " 'in a joking manner that if he were a juror he would impose the death penalty on Mr. Danks.' " (*Id*. at pp. 299-300.) In concluding there was no substantial likelihood K.A. was actually biased as a result of this conversation we observed: "K.A. told her pastor she had nothing to talk to him about, and he nevertheless insisted on imparting his personal, unsolicited view regarding the appropriate penalty verdict. The conversation then apparently ended, at least on this subject. . . . [T]he pastor stopped talking immediately and . . . K.A. did nothing to continue the conversation." (*Id*. at p. 307.)

Juror B.P. (B.P.) told her pastor she was " ' "doing jury duty on a murder case," ' and asked, " 'Is there anything in the Bible which speaks against the death penalty?" ' " (*Danks*, *supra*, 32 Cal.4th at p. 301.) Her pastor responded: " ' "[B.], I think I know what case you are on. There is no place in the Bible that takes the law out of the Bible. If you are sitting on the case I'm thinking you are

50

sitting on, if I was in your shoes, I would not hesitate to give him the death penalty." ' " (*Ibid*.) We observed: "B.P. had already voted three times for the death penalty on Friday, and made up her mind, presumably after an impartial consideration of the evidence and application of the law before her, as to the appropriate penalty in this case. [Fn. omitted.] Her general inquiry to her pastor was to determine not whether her vote was correct, but whether it violated a religious proscription. Moreover, her pastor's personal view of the appropriate penalty in the case he thought . . . B.P. was sitting on was unsolicited," and the conversation at least on this subject "apparently ended at this point." (*Id.* at pp. 309-310.)

Here, by contrast, Y.M. actively solicited his pastor's comments about the role of mercy and sympathy while still wrestling with his decision, spoke to him about this subject for 15-20 minutes, and was given directions inconsistent with the jury instructions.

The totality of the circumstances demonstrates a substantial likelihood that Y.M. was influenced or actually biased against defendant by his improper conversation with Reverend Sutton, and that his vote to impose the death penalty was not based solely on the evidence and the instructions. For these reasons, we reverse the judgment of death.

## 2. *Asserted errors in noncapital sentencing*

For the guidance of the trial court, we address defendant's contention that the trial court committed several errors in sentencing him on the noncapital counts. The Attorney General concedes the errors.

Defendant contends that the trial court erred in imposing consecutive terms for the Shockley and Renouf robbery counts (counts two and nine) because these robberies and the attached firearm use enhancements formed the basis for the first

51

degree felony-murder convictions and findings on the robbery-murder special-circumstance allegations. Therefore section 654 precludes the imposition of separate punishment for the underlying robberies. (§§ 211, 213, former § 12022.5.) The sentences for robbery and for the firearm use enhancement in counts two and nine should be stayed. (§ 654.)

Defendant contends that his purpose in shooting Stacy Copeland was to rob her, and because he was sentenced to a nine-year term for her attempted murder, the sentence of one year and four months imposed for his conviction for robbing her (count six) should be stayed. The evidence does not suggest an intent or objective for the shooting other than to facilitate the robbery. The sentence for robbery in count six should be stayed. (§ 654; *People v. Latimer* (1993) 5 Cal.4th 1203, 1216-1217.)

Defendant further contends, and the Attorney General agrees, that the trial court improperly imposed a consecutive sentence of one year and four months for the second degree robbery of Copeland. Section 1170.1, subdivision (a) provides that subordinate terms shall consist of one-third the middle term, which for second degree robbery is three years. (§ 213, subd. (a)(2).)

### III. DISPOSITION

We reverse the judgment of death, remand for retrial on the penalty phase and for resentencing on all counts.  The judgment is affirmed in all other respects.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**POLLAK, J.  \***

_____

\*      Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Hensley
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S050102
**Date Filed:** July 31, 2014
_____

**Court:** Superior
**County:** San Joaquin
**Judge:** Frank A. Grande


_____

**Counsel:**

Richard L. Rubin, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Harry Joseph Colombo, Eric Christoffersen and Clifford E. Zall, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard L. Rubin
4200 Park Boulevard, #249
Oakland, CA  94602
(510) 339-9552

Clifford E. Zall
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5281