Filed 12/1/15  P. v Soto CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OSCAR RICHARD SOTO,<br><br>    Defendant and Appellant. | F068397<br><br>(Super. Ct. No. F11906858)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jane Cardoza, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Oscar Richard Soto, a juvenile, was charged with one count of attempted first degree murder (Pen. Code, §§ 187, subd. (a), 664[1] [count 1]); two counts of first degree residential robbery (§ 211 [counts 2 & 6]); one count of elder abuse (§ 368, subd. (b)(1) [count 3]); one count of assault with a firearm (§ 245, subd. (a)(2) [count 4]); one count of first degree residential burglary (§§ 459, 460, subd. (a) [count 5]); and one count of shooting at an inhabited dwelling (§ 246 [count 7]). The information also set forth a number of special allegations. First, as to counts 1 and 2, defendant discharged a firearm and inflicted great bodily injury on a person age 70 or older. (§§ 12022.53, subds. (b) & (d), 12022.7, subd. (c).) Second, as to counts 3, 4, and 5, he used a firearm and inflicted great bodily injury on a person age 70 or older. (§§ 12022.5, subd. (a), 12022.7, subd. (c).) Third, as to count 6, defendant discharged a firearm and inflicted great bodily injury. (§ 12022.53, subds. (b) & (d).) Finally, as to count 7, he used a firearm. (§ 12022.5, subd (a).)

The jury convicted defendant of attempted second degree murder on count 1, found him guilty as charged on the other counts, and found true each special allegation. On count 1, defendant was sentenced to nine years plus 25 years to life for great bodily injury resulting from firearm discharge. On count 6, he was sentenced to 16 months plus 25 years to life for great bodily injury resulting from firearm discharge, to be served consecutively. The trial court stayed execution of punishment on the remaining counts pursuant to section 654. Defendant received 822 days of presentence custody credit.

On appeal, defendant contends (1) his confession was involuntary; (2) his aggregate term of 60 years four months to life was tantamount to life without the possibility of parole (LWOP), which cannot be imposed on a juvenile who commits nonhomicide offenses; and (3) the trial court erroneously imposed consecutive sentences. We conclude (1) defendant's confession was voluntary; (2) section 3051 eliminates any

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

constitutional infirmity with defendant's aggregate term;[2] and (3) defendant forfeited his claim the trial court erroneously imposed consecutive sentences. In addition, we order the abstract of judgment corrected.

<u>STATEMENT OF FACTS</u>

I.      **Prosecution evidence.[3]**

Marilyn Miller and her 91-year-old mother Marcella Miller lived at 8636 11th Street in San Joaquin. On November 24, 2011, sometime between 1:00 and 1:30 a.m., Marilyn[4] was awakened by "banging" noises. Defendant entered her bedroom and shoved a flashlight into her face. Marilyn screamed. Marcella woke up and walked down the hallway toward her daughter. Defendant confronted Marcella in the hallway, aimed a gun "point blank" at her neck, and said, "Back up, old lady, or I'm going to kill you." Marcella did not move. Defendant shot her in the neck and returned to Marilyn's bedroom. Marilyn cried, "Why are you doing this?" Defendant, armed with the gun, asked, "Where's the gold?" He rummaged through drawers, grabbed a jewelry box, and fled. Marcella entered Marilyn's bedroom and collapsed on the floor. She was bleeding

---

**2**     This particular issue is on review before the California Supreme Court in a number of cases. (See, e.g., *People v. Saetern* (2014) 227 Cal.App.4th 1456, review granted Oct. 1, 2014, S220790; *People v. Gonzalez* (2014) 225 Cal.App.4th 1296, review granted July 23, 2014, S219167; *People v. Solis* (2014) 224 Cal.App.4th 727, review granted June 11, 2014, S218757; *People v. Franklin* (2014) 224 Cal.App.4th 296, review granted June 11, 2014, S217699; *In re Heard* (2014) 223 Cal.App.4th 115, review granted Apr. 30, 2014, S216772; *People v. Martin* (2013) 222 Cal.App.4th 98, review granted Mar. 26, 2014, S216139; *In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214652.)

**3**     As part of the prosecution case, the jury watched a video recording of defendant's confession. (See at pp. 4-9, *post*.)

**4**     To avoid confusion, we identify individuals who share the same surname by their first names. No disrespect is intended.

profusely. Marilyn called 911. Marcella was transported to a hospital, where she underwent surgery to close her wound.[5]

Several days after the incident, Detectives Brandon Pursell and Mark Chapman of the Fresno County Sheriff's Office watched a surveillance video recorded at a convenience store near the Millers' residence. The footage led them to defendant's mother, Eugenia "Gina" Valdez.[6] Pursell and Chapman visited her home, where she lived with defendant and her other children. The detectives spoke to defendant, who was "very nervous" and had "wet, clammy hands." Afterward, they phoned defendant's aunt Constance Valdez "[t]o verify where [defendant] was at the time of the event." Constance's responses "led [the detectives] back to … defendant."

On December 2, 2011, defendant was arrested, taken to the sheriff's substation in San Joaquin, and then moved to sheriff's headquarters in Fresno for an interview.[7] He was placed in a holding cell at around 3:00 p.m. At some point, defendant tied his shirt around his neck in an attempt to kill himself. He lost consciousness. After he was revived, defendant was transported to a hospital for a psychological evaluation pursuant to Welfare and Institutions Code section 5150. Four hours later, sometime after 8:00 p.m., he was brought back to headquarters.

Defendant, Pursell, and Chapman convened in an interview room at 8:46 p.m. Pursell removed defendant's handcuffs and Chapman offered him food. For about 17 minutes, the three ate burgers and fries, drank soda, and briefly discussed football and the whereabouts of Gina and defendant's siblings. Chapman also gave defendant a

---

[5] Three months after the incident, Marcella underwent surgery to remove the bullet. Since the shooting, her right arm has remained paralyzed.

[6] Defendant's mother was charged with being an accessory after the fact to a felony (§ 32 [count 8]) and threatening a witness (§ 140, subd. (a) [count 9]). Her case was severed and is not before us on this appeal.

[7] Gina was also arrested and brought to headquarters separately.

sweatshirt to wear over his hospital gown.  Thereafter, Pursell informed defendant of his constitutional rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Defendant indicated he was aware of his *Miranda* rights and agreed to talk.  Pursell told defendant:

> "I think that you have some remorse about some things that happened.  I think that you feel bad about some things that happened and we wanna talk about it, but it's not gonna be easy to talk about.  And all I want to do today is I want to get closure for everyone.  I wanna put this behind all of us.  I think that what happened happened and we need to move past it, I really do.  I think it's the healthiest thing for you.  I think it's the best thing for your family.  I think it's the best thing for everyone, our victim, everybody…. [¶] … [¶]
>
> "… [T]his is part of the closure for that, this is part of how we finish everything and move on.  And I'm just looking to get truth out of you about everything, so that we can be done with it….  I don't think you're a bad guy, I don't.  I wouldn't sit here and eat food with you, if I thought you were a bad person.  But I know that sometimes good people … do bad things.  Sometimes good people have accidents … they make mistakes.  What's important is what happens afterwards and that's why we're here today.  Because right now we have one side of what happened.  I believe that it's my job to also find out your side of it, because I don't want someone to paint [a] picture of you in a certain way if it's not true.  If [you're] a great guy that made a mistake, I want [you] to have the opportunity to tell me about that mistake, that's all we're trying to do here….  [¶] … [¶]
>
> "… What I'd like you to do is I wanna hear [your] side of the story start to finish.  [¶] … [¶] … Get it out, it's gonna make you feel better, I think.  I think that you have a big burden on you and you need to get it out.  So, what I'd like to do is, I'd like just in your mind go back to that day and let me know what happened.  And take your time, I know it's gonna be tough."

Defendant related he left an aunt's house[8] and went to the Millers' residence, which he believed was unoccupied.  After he entered the dwelling, he came across "a girl

---

[8]     Defendant mentioned two of his aunts lived in San Joaquin:  Constance (*ante*, at p. 4) and Jacklyn "Jackie" Valdez.  He did not specify which aunt he had visited prior to the incident.

laying down" and immediately "blacked out." Defendant then saw "the other lady." He "tr[ied] to keep 'em down and … get in and get out" and "had 'em at gun point." The safety mechanism was on. As he was reaching for "something," defendant "felt something … jolt [his] leg" and subsequently "heard [the gun] go off." He ran away to an aunt's house and did not tell anyone about what had occurred.

Pursell said he appreciated defendant's honesty, contrition,[9] and attempt "to do the right thing" and asked for further details. Defendant specified he stopped momentarily at a friend's house at around 11:00 p.m. before he went to the Millers' residence. He did not have the gun when he was at his aunt's house and did not procure it from his friend. When asked how he came into possession of the weapon, defendant insisted he "found it." He also maintained he was the lone perpetrator. At the Millers' residence, defendant "let off a round through the window" and entered. Once inside, he used a flashlight and looked for jewelry and "anything valuable" to steal. Defendant eventually encountered the "63-year-old,"[10] "blacked out," and "yelled at her." She yelled back. Next, the "mom c[a]me[]" and defendant "made her get into the room." He asked the women for jewelry and gold, instructed them to "'sit still,'" assured them he was "'not trying to hurt [any]one,'" and even apologized. As defendant was reaching for a jewelry box, the "old lady" grabbed his leg and the gun discharged. He fled with the jewelry box but abandoned it after exiting the premises.

Pursell advised defendant:

"I understand that you're being a man about this … [¶] … [¶] … and that you're accepting responsibility for this.… [W]hat I do need … is I need all of the truth about everything, okay?… I'm not trying to get you to get anybody else in trouble, but … I need to know everything that happened. We've spoke[n] with your mom, we spoke with other people, a lot of other

---

[9] Throughout the interview, defendant expressed remorse for his actions.

[10] Defendant knew the victims' ages because he had read a newspaper article about the incident.

people and I feel that we know what happened after the fact and we've accepted that, but part of what you're doing is coming clean completely. And I need you to verify that what everyone else told me is true. And I believe that what your family and everybody told me is true. Even though they were scared to tell me just like you're scared to tell me, I don't think that this is … you telling on your family, because your family has told us their involvement … and your mom is the only one that we've taken to jail, okay?"

Defendant added he went to Constance's house from the Millers' residence. There, he "cr[ied] hysterically" and told his aunt he "did something bad" and "shot somebody." Defendant asked Constance to "take [him] somewhere." Instead, she called Jackie (see *ante*, fn. 8), who arrived alongside Gina and drove defendant to his sister's house. When asked about the whereabouts of the firearm, defendant claimed he "threw it in the dumpster."

Pursell and defendant engaged in the following colloquy:

"[PURSELL:] Okay. I think you're telling us a lot of truth, … but … *we know*….

"[DEFENDANT:] I'm sorry, I'm sorry, I just … and I just …

"[PURSELL:] … I just want the truth. [¶] … [¶]

"[DEFENDANT:] … I'm holding up you know and part of being a man, I gotta you know take my responsibility. I just don't want … see no one else suffer from my actions, you know?

"[PURSELL:] I understand. [¶] … [¶] … But …, can I tell you something truthfully? [¶] … [¶] … I think we know … pretty much the whole story, but I need to hear it from you.

"[DEFENDANT:] Right.

"[PURSELL:] So, there's really no point in lying, because it just makes you seem …

"[DEFENDANT:] Sad?

"[PURSELL:] … [L]ike a bad person and I don't think that you are ….

7.

"[DEFENDANT:] I, I just don't want no one to suffer, no one else. [¶] …
[¶] … I don't wanna make my family suffer no more.

"[PURSELL:] … [T]he way to do that is to tell the truth and the whole
truth about everything.

"[DEFENDANT:] Alright.

"[PURSELL:] And then the more truth comes out right now, the less likely
it is to fall back on them, okay?

"[DEFENDANT:] Alright." (Italics added.)

Defendant revealed Gina, Jackie, and a cousin arrived at Constance's house. He "told all of 'em what happened." Jackie "got rid of" the gun as well as defendant's clothes and drove defendant to his sister's house in Kerman, where he stayed the night. Sometime afterward, defendant had a family friend dispose of his shoes because he "kn[e]w [he] had left tracks" at the Millers' residence.

Pursell advised defendant again:

"[L]ike we said we know about what's already happened, okay? [¶] … [¶]
… [L]et's just come clean, tell me about everything. [¶] … [¶] …
[T]here's a couple of other things that I think maybe you're not truthful
with, so let's clear those up, so we're all done. [¶] … [¶] … And I
understand you're not trying to get anybody in trouble, but understand we
know what's what."

Defendant divulged he and his friend Tommy Avila "scope[d]" the Millers' residence at approximately 11:00 p.m. Next, they went to defendant's aunt's house and ate. At 1:00 a.m., defendant left for the Millers' residence by himself. Avila had departed earlier, having decided not to participate in the break-in. At no point did defendant stop at a friend's house before going to the Millers' residence. Although he previously burglarized schools, he had never burglarized a home. As a result, for the first time, defendant brought a firearm "for protection." He borrowed the gun from an older friend nicknamed "Bubba" "a day or two prior." Defendant was also under the influence of marijuana at the time of the incident.

Chapman asked defendant if he still "fe[lt] like … hurting [him]self[.]" Defendant answered in the affirmative and remarked, "I just feel they'll feel better if you know they found [out] … [I] died, you know?"

The interview—from the time of defendant's *Miranda* waiver until the end of questioning—lasted less than two hours.

## II.    Defense evidence.

Defendant, who was 17 years of age at the time of the incident, testified he and a companion surveyed the Millers' residence at either 10:00 or 11:00 p.m. and concluded no one was home. They left and went to defendant's aunt's house. There, after his companion departed, defendant ingested marijuana and cocaine. His companion did not want to be involved in a burglary. At around 1:00 a.m., defendant returned to the Millers' residence on his own. He brought a flashlight as well as a loaded firearm but did not intend to shoot anyone. Defendant did not expect to find people in the house, but, if someone was inside, he planned to use, "[p]robably" point the gun at the occupants of the house to scare them. If the occupants did not do what he directed and, instead, came at him, his plan was "[p]robably" to point the gun at them with "[p]ossibly" his finger on the trigger and "[p]robably shoot." He used the gun to break the back patio door lights. He also used the gun on the back window ultimately shooting through the window, breaking it. He reloaded the gun and entered the house. Defendant had the hood of his sweatshirt pulled up over his head and a bandana around his face covering his nose.

Inside the house, defendant opened a bedroom door and—to his surprise— encountered Marilyn, who screamed. He pointed the gun at Marilyn. As he was backing away, he saw Marcella walking down the hallway. He pointed the gun at Marcella. Marcella entered Marilyn's bedroom and fell onto the floor. Meanwhile, defendant searched the bedroom and found a jewelry box. As he was seizing it, he suddenly "felt something" "grab onto [his] leg." Defendant "jolted" and "heard the gun go off." He

fled with the jewelry box but later discarded it. Defendant ran to his aunt's house, where he "broke down[ and] started crying" and Jackie "took" the gun.

A few days after the incident, defendant was apprehended and brought to sheriff's headquarters in Fresno. He tried to kill himself in the holding cell. Following the failed suicide attempt, defendant was taken to the hospital. While he was lying on a spinal backboard and wearing a cervical collar, he was questioned by Pursell. Defendant was "crying" and "highly emotional." He initially told Pursell he was only a lookout but eventually told the detective "the truth."

## DISCUSSION

### I.  Defendant's confession was voluntary.

a. *Background.*

i. The suppression motion.

Defense counsel moved in limine to suppress defendant's confession at sheriff's headquarters on Fifth and Fourteenth Amendment grounds. He asserted defendant was in a pained, hysterical condition and lacked "sophisticated experience in the [judicial] system" yet subjected "nonstop" to "unconstitutional methods of coercion and duress" after his arrest and frequently "press[ed]" "until he br[oke]." Hence, his confession "was clearly a product of … intentional manipulation of his fragile emotional condition." Defense counsel cited as supporting authority *Doody v. Ryan* (9th Cir. 2011) 649 F.3d 986 (*Doody*), inter alia.

ii. The hearing.

The trial court conducted a hearing pursuant to Evidence Code sections 402 and 405. In addition to watching the videotaped confession (*ante*, at fn. 3), it listened to four audio recordings made by Pursell on December 2, 2011.

1. Contents of the first recording.

At 2:06 p.m., Pursell, Chapman, and defendant departed for sheriff's headquarters in Fresno from the sheriff's substation in San Joaquin. Defendant was wearing a T-shirt, a sweatshirt, and shorts but not shoes. At the beginning of the car ride, Chapman turned on the air conditioner.

Roughly 25 minutes into the trip, Chapman addressed defendant:

"[Y]ou're obviously under arrest.… [W]hen we get to headquarters, we're taking you to our … office and … we'd like to talk to you. We'd like to get your side of the story.… [Y]ou know I … think it's been a crazy week for y[ou]. In fact, I know it has. And, the only thing that we're going to ask is that you be honest with us about everything.… [T]here are two types of people that we normally encounter.… 'cause we do work homicide. There'[re] monsters, and there'[re] other people who … commit crimes for other reasons. We don't think that you're the monster. But, we don't know that…. I'd like to think that … you're remorseful. That things didn't need to go the way they went …. And, the other thing is, don't underestimate [Pursell] and I as investigators, as detectives. You know, we've been in … your community every day [f]or the last seven, eight days.… [Y]ou've probably seen us around. I know we [talked] on Wednesday. Okay[?]… [Y]ou know, there'[re] eight people on our team. And, there were eight people doing work on this case. Because … it was very important to a lot of people. It was important that this case got resolved so people didn't have to live in fear out there, in San Joaquin. Because … they were living in fear. Because … nothing like this ever happened out there. So we're gonna go downtown. That's where we're going now. We'd like to talk to you.… [J]ust so you know, … your mom's in custody as well. And … I anticipate there'll be other arrests. And … you know we just want you to do the right thing …. [W]e just want you to be responsible for what happened out there. Nothing more, nothing less. If you're not a monster, then we need to know that. You know, there's who, what, where, when and why. There's really only one thing that's unclear to us. And that's the why. Usually, when we work cases, … the who, what, where, when[,] all those are pretty easy to identify … and … to investigate. The hardest thing to investigate for us … is the why.… [Y]ou're 17 years old …, you're nearly an adult. [¶] … [¶]

"… [W]e're just asking you to be honest with us. Sometimes it's hard to be truthful and honest about things but, I will tell you this, you'll feel better after getting it out. Getting everything out in the open you'll feel better

11.

inside. It'll be like … if you work out…. [W]hen you're doing bench press[es]…. I know there'[re] a lot of emotions inside of you right now and, by being honest with us, it'll be like those two 45-pounders or … four 45-pounders, whatever you bench press. It'll be just like getting 'em off your chest. And, you know[,] people read our reports and, if you're not truthful with us, they're gonna know. They're gonna know. So … are we. We just want you to do the right thing. Do the right thing for yourself, for your family and … for the victim's family. So, when they come back out and they return to your … community where you live, they don't have to live in fear."

Chapman then added:

> "[Y]ou asked me if you were ever gonna get out. That's not up to us. You know all we do is collect information. We talk to people. We get out of the car, we get out of the office, we investigate. And … we collect information. And … then … what we do is … we document our information. And … we forward all that information … to another office of the county, the District Attorney's Office. [¶] … [¶]

> "… [I]t's other people that make those decisions. But, … today it's your turn to make a decision, a decision to do the right thing[,] what I think … and what [Pursell] thinks is the right thing to do. You know, we're not bad guys…. I'm not gonna sit here and pretend that you know that you're gonna trust us.… [B]ecause, you know, we don't know each other. And, there's a six foot wall between us and you, because we're the police and you're [you]…. I'm not gonna expect you to trust us, but we're not bad guys. I'm gonna tell you that. And, we're not gonna fabricate our reports[:] the truth is what it is. It's the truth.… [Y]ou know, when we get up there, the decision will be yours. I just hope you make … the decision that's right for you, the right decision for your family[,] and … the right decision for … the victims in this."

The trio arrived at headquarters at 2:43 p.m. Less than three minutes earlier, defendant indicated he was cold. Chapman promptly turned off the air conditioner. During the drive, which lasted less than 40 minutes, defendant was neither questioned about the incident nor advised of his *Miranda* rights.

### 2. Contents of the second recording.

At approximately 3:45 p.m., an ambulance carrying defendant and Pursell proceeded to the hospital following defendant's failed suicide attempt in a holding cell.

Defendant was strapped to a spinal backboard and wore a cervical collar. In response to a paramedic's inquiries, he related he tried to strangle himself, lost consciousness, hit his head on the floor, and sustained neck pain. Defendant apologized and declared, "I just don't want to live no more." He wept throughout the ride.

Before arriving at the hospital, the paramedic asked Pursell if he had the "form." Pursell replied, "We will." During the drive, which lasted less than 10 minutes, Pursell did not talk to defendant.

### 3. Contents of the third recording.

In a hospital corridor, starting at around 4:10 p.m., Pursell spoke to defendant for 12 minutes. Believing there was a "high potential" of eliciting incriminating statements, the detective recited the *Miranda* warning at the outset. Defendant indicated he was aware of his *Miranda* rights and agreed to talk.

Pursell stated he needed to complete paperwork pursuant to Welfare and Institutions Code section 5150. He asked defendant for his date of birth, home address, and phone number and whether he knew the current date and his location. Defendant was responsive. Pursell frequently asked defendant why he wanted to kill himself. Defendant articulated he "d[id]n't want to live no more," "hate[d] life," and "want[ed] to be with" his deceased uncle Henry Valdez. He denied feeling guilty or even knowing why he was in custody. When asked if he wanted to relay a message to Gina, defendant said, "I love her." When asked if he wanted to relay a message to the victim, he moaned, "[W]hat the fuck [are] you talking about?" Defendant was emotional throughout this exchange.

Pursell stopped recording at 4:22 p.m. as defendant was being moved to another corridor.

### 4. Contents of the fourth recording.

At approximately 4:27 p.m., a nurse asked defendant about his neck injury and medical history. Defendant was responsive. The nurse asked about what had transpired. Defendant reiterated he tried to strangle himself, lost consciousness, and hit his head on

13.

the floor. When asked why he tried to commit suicide, he answered, "I wanted [to be with] my tio.[11]" Defendant remained on the spinal backboard.

After the nurse left, Pursell told defendant, "I know that you want to talk to me." Defendant replied, "I don't want to be here no more."[12] Pursell continued:

> "I think it's time to take responsibility for what happened. Okay? No one else needs to suffer in this. Okay? You're 17. You're not a little kid. It's time to do the right thing …. If you made a mistake, you made a mistake. If it was an accident, it was an accident. Just want to know …. Just want to know. Just want to know the truth. That's all. That's all I want, … the truth. That's all. I want to know what happened. Just want to know the truth about it. I think you feel bad about what you did. I want to be able to go to the victim. And I want to tell her that you did the right thing. I want to tell her whether or not you have remorse for what you did. That's all I want. All I want is to [be able to talk to the] victim. That's it …. That's the only reason I'm here. [¶] … [¶]

> "… If things were an accident out there, … I want to know. That's all I want to know. I don't think you're the monster …. I think you made a mistake. What happened out there …? It's time, … it's time. Okay?… [W]hat happened out there? Was there anyone else there with you? Is there anything you want me to tell that old lady? Is there anything you want me to tell her …?"

Defendant apologized repeatedly "for what happened." He began to hyperventilate. Pursell instructed defendant to "take a deep breath" "in through [the] nose" and "out through [the] mouth." The detective then said, "Are you ready to tell me the truth now?... [¶] … [¶] … I'm trying to give you an opportunity. That's all that I'm trying to do." Defendant told Pursell, "I want to talk to you alone." Pursell replied, "[W]e're in the middle of this hospital, bro. We can't like go into a room." Defendant admitted he was "there that night," but was "not comfortable" providing any more information unless he was taken to a private room. Pursell acquiesced.

---

**11**     "Tio" means "uncle" in Spanish.

**12**     Defendant was distraught for the duration of the interview.

In a hospital room, defendant claimed he was "supposed to be lookout" for an older male named David, his "tia's[13] ex." He denied entering the Millers' residence. Instead, defendant stayed outside. When he heard the gunshot, he ran away to his aunt's house. Pursell remarked, "[T]hat's not the truth…. I know that you were in the house. [¶] … [¶] … I just want to know what happened. I want to know why someone got shot. That's all …. I just want to know." Defendant apologized repeatedly. Thereafter, he divulged:

> "It wasn't supposed to happen. [¶] … [¶] … I think it was supposed to be on safety. [¶] … [¶] … It was supposed to be on safety…. I don't know why … I was just reaching for something. I was just reaching for something and, and it just went off. It wasn't, ah man, it went off. [¶] … [¶] … I'm sorry, I'm sorry. [¶] … [¶] … I swear to God, I'm sorry. [¶] … [¶] … I'm sorry, I'm sorry. Fuck man. [¶] … [¶] … Tell her please, I'm sorry. Tell her I'm so fucking sorry. [¶] … [¶] … Tell her, it was never my intention, it was never my intention. [¶] … [¶] … I thought the house was empty. And I, I was, just you know, … I just reached for something …. Like, I don't know, she was on the floor and she like kind of kicked me and [I] just heard this shit go off…. [¶] … [¶] … I was, oh my [gosh], man…. I'm sorry, I'm sorry. [¶] … [¶] … I[] don't give a fuck man, give me … whatever you guys want to give me, I'll fuckin' take it, I'm sorry. [¶] … [¶]
>
> "… I'm sorry, I didn't want to do that. I didn't…. [W]hile I was in there, I was even, … fuck I even apologized to her while I was in there. I told her I'm sorry. I told her. You can ask her that. [¶] … [¶] … I just told her just to … get down you know I panicked. I just told her you know get down…. I don't want to hurt you guys. I didn't want [to] hurt nobody. And, ah I took my hand off the gun for … one second…. [J]ust to gather some stuff, you know, and … I don't know I felt someone like grab a hold of my leg and it just went off. And it was supposed to be on safety. The safety didn't work. The safety didn't work. [¶] … [¶] … I thought it was empty, and I was just gonna get these like, like a little figure was in there that's all. But, I wasn't intending to use it. I swear, it was just all scared. It was all scared. I swear to God it was. I'm sorry, I'm sorry."

---

**13**     "Tia" means "aunt" in Spanish.

Defendant specified he had been by himself and "on drugs." He entered the Millers' residence through a window, which he shot. Defendant took something when he fled the dwelling but "threw it … when [he] got out the window" on account of guilt. He asked Pursell, "Is she still alive?" Pursell answered, "She is." Defendant then asked, "Is she gonna die?" Pursell answered, "Um, I think she's gonna live, but, we don't know yet." Again, defendant apologized profusely. Before he left for headquarters, Pursell told defendant, "I don't think you're the animal that people think. And, I'm gonna let them know that, okay?"

The interview lasted about 22 minutes.

### iii. The ruling.

The trial court denied defense counsel's suppression motion. It reasoned:

> "A confession or admission must be voluntary. And in determining the voluntariness, the Court will look to the totality of the circumstances of the interrogation, fully examining the circumstances surrounding the making of the statement. A confession … may be found involuntary if extracted by threats or violence obtained[,] by direct or implied promises[,] or secured by the exertion of improper influence.

> "Some of the factors that the Court must consider in evaluating the voluntariness of a confession or admission are (1) the length of the interview and attitude of the police; (2) the characteristics of the defendant, his age, intelligence, or mental and physical infirmities; (3) the condition of the defendant during the interview, whether he is experiencing fatigue or food deprivation; (4) the relationship between the police interviewer and the suspect; and … another consideration is whether the defendant waived his *Miranda* rights.

> "… [I]t's well established that general advice or encouragement to tell the truth in the absence of threats … by the police is permissible. [¶] Similarly, an officer merely commenting on the realities of a defendant's situation and the avenues of conduct available to him or conveying the potential advantages that would normally develop from an honest accounting do not render a confession involuntary.

> "It is improper for law enforcement to capitalize on a defendant's unusual or unique physical or mental condition. However, in the absence

16.

of police coercion, such condition will not work to make a statement involuntary….

"In the present case, the defense relies on the case of *Doody*, [*supra*, ]649 F.3d 986. Other than the age of the defendant Doody and the defendant in this case, … the case of [*Doody*] is factually distinguishable from the present case.

"In [*Doody*] the defendant was subjected to a nonstop interrogation which began at 9:25 p.m. and concluded at 10:00 o'clock a.m. the next day. The entire interrogation lasted approximately 13 hours. Three detectives participated in the interrogation. Working in shifts, the police kept Doody awake overnight…. [¶] … Doody … lacked knowledge of the rights commonly known as *Miranda*. Moreover, the facts in *Doody* reflect that the defendant was sleep deprived. [¶] … [¶]

"… [T]he circumstances surrounding Mr. Soto's statements differ markedly from the circumstances in *Doody*. Here, Mr. Soto … was familiar with *Miranda*…. [¶] … [He] was arrested in his home in the daytime on December 2nd, 2011…. He was transported to the … sheriff's substation in San Joaquin and then shortly thereafter to the sheriff's headquarters in downtown Fresno. [¶] The car ride was approximately 35 to 40 minutes long…. The facts borne by the evidence was that he was barefooted ….

"After viewing the videos that were played during the evidentiary hearing, the Court concludes that Mr. Soto appears to be of average height and weight for a 17-year-old. After reviewing the tapes, both the audio and video, there is no evidence whatsoever that Mr. Soto was sleep deprived during … the time he was with law enforcement. Furthermore, he was not subject to relentless interrogation for 13 hours without the protections of proper *Miranda* warnings.

"There is no evidence that the officers demonstrated any callousness. Indeed, in the present case, Mr. Soto was coherent, alert, responsive to questions, and he responded appropriately. At times Mr. Soto became emotional and cried, understandably, because he had been placed under arrest and he had just attempted to take his life. However, there's no evidence that he became hysterical or nonresponsive….

"Unlike the case in *Doody*, there was no badgering of Mr. Soto by the detectives. [During t]he car ride from San Joaquin to Fresno and during the time he was placed in the holding cell before he attempted to take his life, it's clear to the Court that he had the opportunity, unpressured by the

17.

police, to consider his situation. He was aware that the police were investigating his possible role in the robbery and shooting that had just occurred in San Joaquin.

"The evidence presented shows that Mr. Soto was questioned at the hospital and at the interview room of the sheriff's department after being properly given his *Miranda* rights. Mr. Soto was not deprived of food or water. He was indeed provided medical attention and psychiatric evaluation. There's no evidence that he ever had a break with reality…. [¶] … [¶]

"Here the evidence does not support the … contention that the methods used by the detectives were coercive. There's no evidence to support the … contention that the confessions were a product of police coercion. The Court finds that the tone used by the detectives at all times was evenhanded with … defendant.

"The first statement given by Mr. Soto was … in essentially a public place, the hospital hallway, and then in a hospital room. During that encounter the detective advised Mr. Soto of his rights…. After a brief conversation, … defendant is moved by medical staff according to Detective Pursell. The detective resumes talking with Mr. Soto. Mr. Soto begins to breathe rapidly, and the officer[] tell[s] him how to breathe.

"Next … defendant asked to speak to … Detective Pursell in private. This is significant in the Court's mind because it reflects that … defendant is clearly voicing his desire [as] to whom to speak … and where that conversation is going to take place. This reflects that his free will is fully intact.

"The Court concludes that even though he had just attempted suicide, Mr. Soto was alert and oriented. He was very much awake and aware and knew what was going on.… [D]efendant then proceeds to say he is sorry and ultimately implicates a third person, and then confesses that he was inside the home.

"… [D]efendant is released from the hospital later that same day …. He is then transported to the interview room at the sheriff's department. After having dinner with the detectives, he's again Mirandized and is interrogated. A confession is given by … defendant.

"… The Court finds no police misconduct or coercion to render [defendant]'s statements involuntary. The lack of shoes or the temperature

in the car ride from San Joaquin to Fresno does not negate the voluntary nature of … defendant's statements.

> "Accordingly, the Court finds that the facts in *Doody*[, *supra*, 649 F.3d 986] are factually distinguishable from the case at hand; and, therefore, given the Court's specific findings and the credible testimony of Detective Pursell, the Court will deny the [suppression] motion …. The evidence clearly establishes … that the statements made by Mr. Soto were voluntary."

b. *Standard of review.*

On appeal, a trial court's ruling on the voluntariness of a confession is reviewed de novo while its findings on the circumstances surrounding the confession are upheld so long as they are supported by substantial evidence. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086; *People v. Massie* (1998) 19 Cal.4th 550, 576.) Where a confession has been recorded, "[t]he facts surrounding [the] … confession are undisputed …, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177, citing *People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

c. *Analysis.*

A defendant's involuntary confession to law enforcement officers is inadmissible pursuant to the Fifth and Fourteenth Amendments to the United States Constitution (*People v. Rundle* (2008) 43 Cal.4th 76, 114, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *Dickerson v. United States* (2000) 530 U.S. 428, 433-434) as well as article I, section 7 of the California Constitution (*People v. Dykes* (2009) 46 Cal.4th 731, 752). "The requirement that a confession be voluntary is one of public policy, and it is a fundamental right of the defendant, denial of which is a violation of due process." (*People v. Kendrick* (1961) 56 Cal.2d 71, 83; see *Rogers v. Richmond* (1961) 365 U.S. 534, 540-541 ["[C]onvictions following the admission into evidence of confessions which are involuntary, *i.e.*, the product of coercion, either physical or psychological, cannot stand. This is so … because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that

19.

ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth."].)  The prosecution must demonstrate the voluntariness of a confession by a preponderance of the evidence. (*People v. Hensley* (2014) 59 Cal.4th 788, 812 (*Hensley*); *People v. Markham* (1989) 49 Cal.3d 63, 71.)

"To determine the voluntariness of a confession, courts examine '"whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.'"  (*People v. Dykes*, *supra*, 46 Cal.4th at p. 752, quoting *Dickerson v. United States*, *supra*, 530 U.S. at p. 434; see *People v. Culver* (1973) 10 Cal.3d 542, 545-546, citations omitted ["[A] confession that is adduced from an individual whose 'will was overborne' … is not 'the product of a rational intellect and a free will' …."].)  "Relevant are 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'"  (*People v. Williams* (1997) 16 Cal.4th 635, 660, quoting *Withrow v. Williams* (1993) 507 U.S. 680, 693.)  Where a confession is given by a juvenile, courts must scrutinize the record with special care.  (*People v. Nelson* (2012) 53 Cal.4th 367, 379; *People v. Lessie* (2010) 47 Cal.4th 1152, 1166-1167.)  Pertinent factors include the juvenile's age, intelligence, education, experience, and capacity to understand the meaning and consequences of the confession (*People v. Lewis* (2001) 26 Cal.4th 334, 383) and whether the juvenile had been ""'"exposed to any form of coercion, threats, or promises of any kind, [or] trickery or intimidation"'""" (*People v. Nelson*, *supra*, at p. 379, quoting *People v. Lewis*, *supra*, at p. 383).  (See *People v. Lara* (1967) 67 Cal.2d 365, 383 ["[A] minor has the capacity to make a voluntary confession … without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends

not on his age alone but on a combination of that factor with … other circumstances …."].)

"In evaluating the voluntariness of a statement, no single factor is dispositive." (*People v. Williams* (2010) 49 Cal.4th 405, 436 (*Williams*).)  However, coercive police activity is a prerequisite.  (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 347; *People v. Benson* (1990) 52 Cal.3d 754, 778, citing *Colorado v. Connelly* (1986) 479 U.S. 157, 167; see *Willliams*, *supra*, at p. 437 ["A confession is not involuntary unless … coercive police conduct and the defendant's statements are causally related."].)  "'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied….  "[I]f … the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible …."'  [Citation.]"  (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).)  "'[I]n carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession….'  [Citation.]"  (*Ibid.*)

We find no coercive conduct here.  The record shows defendant, Pursell, and Chapman departed for sheriff's headquarters at 2:06 p.m. on December 2, 2011.  About 25 minutes later, more than halfway into the 37-minute ride, Chapman informed defendant he would be interviewed at headquarters for "[his] side of the story" and encouraged him to be honest and "do the right thing" for himself, his family, and the victims.  The detective remarked that "[g]etting everything out in the open" would be akin to "getting [45-pound weights] off [one's] chest."  (See *Holloway*, *supra*, 33 Cal.4th at p. 115 ["'[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not

21.

render a subsequent confession involuntary….'"]; *People v. Spears* (1991) 228 Cal.App.3d 1, 22, 27-28 [detective's remark to the defendant—i.e., "'it's about time you got this off your chest'"—did not constitute an implied promise of benefit beyond the psychological relief that would naturally flow from telling the truth].) Chapman detailed his and Pursell's responsibilities as homicide investigators, their encounters with "monsters" and those who "commit[ted] crimes for other reasons," Gina's arrest, and the time, effort, and personnel dedicated to the case, inter alia, but stressed neither he nor Pursell had any influence over sentencing. He did not threaten or promise leniency to defendant.[14]

At the hospital, following defendant's failed suicide attempt, Pursell recited the *Miranda* warning. Although he was still lying on a spinal backboard and wearing a cervical collar, defendant agreed to waive his *Miranda* rights, demonstrating he was not "so … medically weakened that he did not freely and deliberately choose to speak with law enforcement officials." (*Hensley*, *supra*, 59 Cal.4th at p. 814.) In a 12-minute exchange, Pursell—who was filling out paperwork pursuant to Welfare and Institutions Code section 5150—frequently asked defendant why he tried to kill himself. Emotional yet coherent and responsive, defendant said he simply did not want to live and wanted to

---

**14** Defendant alleges he had been "interrogated" without being advised of his *Miranda* rights (1) en route to sheriff's headquarters in Fresno from the sheriff's substation in San Joaquin; and (2) en route to the hospital following his suicide attempt. With regard to the latter, we disagree. The record clearly establishes Pursell did not speak to defendant for the duration of the ambulance ride.

With regard to the former, while Chapman did not directly question defendant about the incident, his comments about honesty and "do[ing] the right thing" could have "'"reasonably be[en] construed as calling for an incriminating response."' [Citations.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 198.) Nonetheless, the record demonstrates defendant—in the wake of these remarks—was mostly quiet. In fact, he did not offer any inculpatory statements until after Pursell recited the *Miranda* warning at the hospital. We further point out Chapman's comments bear little resemblance to the two-step questioning technique—based on a deliberate violation of *Miranda*—employed by law enforcement in *Missouri v. Seibert* (2004) 542 U.S. 600.

22.

join his deceased uncle. He even denied feeling guilty, knowing why he was in custody, and knowing any victim. At no point did Pursell threaten or promise leniency to defendant.

Approximately five minutes later, after defendant was moved to another corridor and spoke to a nurse about his self-inflicted injuries, Pursell encouraged defendant to be honest (see *Holloway*, *supra*, 33 Cal.4th at p. 115) and insinuated the shooting may have been inadvertent (see *id.* at p. 116 [detective's suggestion that a killing might have been accidental does not amount to an implied promise of lenient treatment]). Defendant, who was still emotional, apologized profusely "for what happened," briefly hyperventilated, and requested to speak to the detective in private. In a hospital room, defendant—in an exercise of free will—falsely claimed to be someone else's lookout. When Pursell accused him of lying (see *People v. Enraca* (2012) 53 Cal.4th 735, 755 [police officers may accuse a suspect of lying]), defendant finally admitted breaking into the Millers' residence to rob it and accidentally shooting Marcella. (See *People v. Smith* (2007) 40 Cal.4th 483, 502 ["Insofar as a defendant's claims of involuntariness emphasize that defendant's particular psychological state rendered him open to coercion, this court has noted that '[t]he Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion."'"]; see also *People v. Carrington* (2009) 47 Cal.4th 145, 176 ["'The compulsion to confess wrong has deep psychological roots, and while confession may bring legal disabilities it also brings great psychological relief.'"].) Pursell did not threaten defendant or promise any leniency during this 22-minute exchange.

Sometime after 8:00 p.m., defendant was brought back to sheriff's headquarters. At 8:46 p.m., in the interview room, he had his handcuffs removed and was given food. For about 17 minutes, the three ate burgers and fries, drank soda, and briefly discussed football and the whereabouts of Gina and defendant's siblings. Chapman also gave defendant a sweatshirt to wear over his hospital gown. (See *People v. Thomas* (2012)

23.

211 Cal.App.4th 987, 1011 [removal of handcuffs and offer of food militated against finding that the defendant's will was overborne]; see also *Williams*, *supra*, 49 Cal.4th at p. 447 ["Nor is it inherently coercive for an interrogator to attempt to form a rapport with the suspect."].) Thereafter, Pursell reread the *Miranda* warning and defendant again agreed to speak. Throughout the interrogation, which lasted less than two hours, Pursell encouraged defendant to be truthful. (See *Holloway*, *supra*, 33 Cal.4th at p. 115.) He did not threaten defendant or promise leniency. Instead, Pursell developed a rapport by acknowledging defendant's remorse and attempt to "do the right thing," telling defendant he was not "a bad person," and pointing out that even "good people" "make mistakes." (See *Williams*, *supra*, at p. 447.) This resulted in a detailed confession.

Defendant was interrogated at the hospital for about half an hour and at the sheriffs' headquarters for about two hours. The interviews were separated by a four-hour block. "These circumstances hardly reflect the kind of continuous, prolonged interrogation that has been found to render a resulting confession involuntary." (*People v. Linton*, *supra*, 56 Cal.4th at p. 1178.)

Defendant claims Pursell and Chapman "softened him up and extracted … a[n involuntary] confession." He cites *People v. Honeycutt* (1977) 20 Cal.3d 150 as supporting authority. In that case, Henry Honeycutt stabbed and slashed a male associate to death with a barbecue fork. (*Id.* at p. 154.) Following his arrest, he was placed in a patrol car along with Detective Williams. (*Id.* at p. 158.) En route to the police station, Honeycutt "volunteered that Williams knew him under a different name" and Williams "recognized [Honeycutt,] whom he had known through police contacts for about 10 years." (*Ibid.*) At the police station, Honeycutt was escorted to the interview room by Williams and another detective. Honeycutt antagonized the second detective by "calling him racist epithets and spitting at him." (*Ibid.*) Once that detective left the room, Williams and Honeycutt engaged in a 30-minute conversation, discussing unrelated past events, former acquaintances, and the victim. Williams "mentioned that the victim had

24.

been a suspect in a homicide case and was thought to have homosexual tendencies."
(*Ibid.*)  In the course of the conversation, Honeycutt "'soften[ed] up.'"  (*Ibid.*)
Ultimately, he "indicated that he would talk about the homicide."  (*Ibid.*)  Honeycutt
"expressly waived his [*Miranda*] rights" and "confessed that he beat and stabbed the
victim."  (*Id.* at p. 159.)  He was subsequently convicted of first degree murder.  (*Id.* at
p. 154.)  On appeal, the California Supreme Court concluded Honeycutt's confession
should have been suppressed because it "result[ed] from a clever softening-up … through
disparagement of the victim and ingratiating conversation …."[15]  (*People v. Honeycutt*,
*supra*, at pp. 154, 160-161.)

*Honeycutt* is inapposite to the instant case.  Pursell and Chapman did not take
advantage of a preexisting relationship with defendant because they had none.  Moreover,
neither detective disparaged the Millers.  (See *People v. Scott* (2011) 52 Cal.4th 452, 478;
*People v. Gurule* (2002) 28 Cal.4th 557, 602.)

To the extent defendant suggests his confession was involuntary because he was
young, lacked experience with the judicial system, and was in a pained and emotional
condition during the interrogations, we remind him "'coercive police activity is a
necessary predicate to the finding that a confession is not "voluntary" ….'  [Citation.]  In
the absence of evidence of coercion, 'we cannot conclude that [a] statement was
involuntary solely because of any alleged physical or mental condition.'  [Citation.]"
(*Hensley*, *supra*, 59 Cal.4th at p. 814.)

## II.     Section 3051 eliminates any constitutional infirmity with defendant's sentence.

Defendant states he was 17 years old when the offenses were committed, his 10
years, 4 months, plus 50 years-to-life term will preclude his eligibility for parole until he
is 73 years old, and his sentence is therefore the functional equivalent of life without the

---

[15]     The California Supreme Court reversed the judgment on other grounds.  (See
*People v. Honeycutt*, *supra*, 20 Cal.3d at pp. 154, 161.)

possibility of parole. As such, he asserts his sentence is unconstitutional under the Eighth Amendment according to *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). He requests a remand with directions to the trial court to either impose "a lesser -- and constitutional -- sentence" or issue an order providing for "a minimum parole eligibility date of 25 years." In the alternative, he requests this court modify his sentence to "provide for a minimum parole eligibility date of 25 years."

The trial court, in sentencing defendant, disagreed with defendant's premise as to his parole eligibility. Section 3051, the court noted, would provide for "a hearing during [his] 25th year of incarceration." [16]

---

[16] Section 3051, added by Statutes 2013, chapter 312, section 4, provides:

"(a)(1) A youth offender parole hearing is a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of any prisoner who was under 18 years of age at the time of his or her controlling offense.

"(2) For the purposes of this section, the following definitions shall apply:

"(A) 'Incarceration' means detention in a city or county jail, a local juvenile facility, a mental health facility, a Division of Juvenile Justice facility, or a Department of Corrections and Rehabilitation facility.

"(B) 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.

"(b)(1) A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a determinate sentence shall be eligible for release on parole at a youth offender parole hearing by the board during his or her 15th year of incarceration, unless previously released pursuant to other statutory provisions.

26.

"(2) A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of less than 25 years to life shall be eligible for release on parole by the board during his or her 20th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions.

"(3) A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions.

"(c) An individual subject to this section shall meet with the board pursuant to subdivision (a) of Section 3041.

"(d) The board shall conduct a youth offender parole hearing to consider release.  At the youth offender parole hearing, the board shall release the individual on parole as provided in Section 3041, except that the board shall act in accordance with subdivision (c) of Section 4801.

"(e) The youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release.  The board shall review and, as necessary, revise existing regulations and adopt new regulations regarding determinations of suitability made pursuant to this section, subdivision (c) of Section 4801, and other related topics, consistent with relevant case law, in order to provide that meaningful opportunity for release.

"(f)(1) In assessing growth and maturity, psychological evaluations and risk assessment instruments, if used by the board, shall be administered by licensed psychologists employed by the board and shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual.

"(2) Family members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime or his or her growth and maturity since the time of the crime may submit statements for review by the board.

"(3) Nothing in this section is intended to alter the rights of victims at parole hearings.

"(g) If parole is not granted, the board shall set the time for a subsequent youth offender parole hearing in accordance with paragraph (3)

27.

The Eighth Amendment to the United States Constitution, which is applicable to the states via the due process clause of the Fourteenth Amendment (*Robinson v. California* (1962) 370 U.S. 660, 675 (conc. opn. of Douglas, J.); accord, *Graham v. Florida* (2010) 560 U.S. 48, 53 (*Graham*)), outlaws the imposition of "cruel and unusual punishments."[17]  This prohibition "guarantees individuals the right not to be subjected to excessive sanctions" (*Roper v. Simmons* (2005) 543 U.S. 551, 560), a right which "flows from the basic '"precept of justice that punishment for crime should be graduated and proportioned to [the] offense"'" (*ibid.*).  The concept of proportionality is "central to the Eighth Amendment" (*Graham*, *supra*, at p. 59) and "view[ed] … less through a historical

---

of subdivision (b) of Section 3041.5.  In exercising its discretion pursuant to paragraph (4) of subdivision (b) and subdivision (d) of Section 3041.5, the board shall consider the factors in subdivision (c) of Section 4801.  No subsequent youth offender parole hearing shall be necessary if the offender is released pursuant to other statutory provisions prior to the date of the subsequent hearing.

"(h) This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or in which an individual was sentenced to life in prison without the possibility of parole.  This section shall not apply to an individual to whom this section would otherwise apply, but who, subsequent to attaining 18 years of age, commits an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison.

"(i) The board shall complete all youth offender parole hearings for individuals who become entitled to have their parole suitability considered at a youth offender parole hearing on the effective date of this section by July 1, 2015."

[17]     On the other hand, article I, section 17 of the California Constitution provides that "[c]ruel or unusual punishment may not be inflicted or excessive fines imposed."  This clause "goes beyond punishment that is 'cruel *and* unusual' under the Eighth Amendment to punishment that is 'cruel *or* unusual.'  The state constitutional provision is broader than its federal constitutional counterpart. [Citation.]  Hence, it necessarily extends at least as far in its protection."  (*People v. Smithey* (1999) 20 Cal.4th 936, 1019-1020, fn. 1.)

28.

prism than according to "'the evolving standards of decency that mark the progress of a maturing society'"'" (*Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2463] (*Miller*)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.' [Citation.]" (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 419.)

The United States Supreme Court "has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2463]), including LWOP for juveniles who commit nonhomicide offenses (*Graham*, *supra*, 560 U.S. at pp. 74-79). In *Graham*, it stated, inter alia:

> "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give [juvenile] defendants … some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance…. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Graham*, *supra*, at p. 75.)

The California Supreme Court extended "*Graham*'s 'flat ban' on [LWOP] … to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of [LWOP]" (*Caballero*, *supra*, 55 Cal.4th at p. 268), concluding that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural

life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment" (*ibid.*).[18]

As noted, *Graham* left it to "the State, in the first instance, to explore the means and mechanisms for compliance" with the requirement to impose a sentence that provides "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham*, *supra*, 560 U.S. at p. 75.) *Caballero* also "urge[d] the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto [LWOP] for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Caballero*, *supra*, at p. 269, fn. 5.) In response, the California Legislature enacted section 3051 for the express purpose of establishing a parole eligibility mechanism in accordance with *Graham* and *Caballero*. (Stats. 2013, ch. 312, § 1; see Historical and Statutory Notes, 51B pt. 2 West's Ann. Pen. Code (2015 supp.) foll. § 3041, pp. 78-79.)

Even assuming arguendo defendant's punishment amounted to the functional equivalent of LWOP in *Caballero*, pursuant to section 3051, subdivision (b)(3), he is eligible for parole in his 25th year of incarceration. Since he is afforded a meaningful opportunity to obtain release well within his natural life expectancy, there is no violation of the Eighth Amendment.

Defendant asserts the trial court was obligated to impose a constitutional sentence in the first instance, warranting a remand for resentencing. We agree the trial court had such a duty. (See *Caballero*, *supra*, 55 Cal.4th at pp. 268-269.) However, defendant does not convince us that a remand for resentencing would reasonably result in a parole

---

[18] The question of "[h]ow *much* life expectancy must remain at the time of eligibility for parole … remains a matter for future judicial development …." (*People v. Perez* (2013) 214 Cal.App.4th 49, 57.)

eligibility date more favorable than the one set forth under section 3051. Accordingly, we decline to order such an idle exercise in this day and age of limited judicial resources.

Alternatively, defendant claims his sentence must be modified to guarantee a parole hearing in his 25th year of incarceration in the event section 3051 is repealed. We disagree. A defendant whose sentence violates the Eighth Amendment but for the provisions of section 3051 may file a petition for writ of habeas corpus should section 3051 be repealed or unfavorably amended. (See *Caballero*, *supra*, 55 Cal.4th at p. 269.)

## III. Defendant's claim the trial court erroneously imposed consecutive sentences is forfeited.

At the sentencing hearing, the trial court imposed the following terms: nine years, plus 25 years to life for great bodily injury resulting from firearm discharge, on count 1 (the attempted murder of Marcella), and 16 months, plus 25 years to life for great bodily injury resulting from firearm discharge, on count 6 (the residential robbery of Marilyn), to be served consecutively. Thereafter, defense counsel—"clearly apprised of the sentence the court intend[ed] to impose" (*People v. Scott* (1994) 9 Cal.4th 331, 356)—raised a single objection:

> "Your Honor, I think I preserved it, but in an abundance of caution, we believe that Penal Code Section 3051 doesn't comport with the US Supreme Court's order in *Graham*. Thank you."[19] (Italics omitted.)

For the first time on appeal, defendant argues the trial court erroneously imposed consecutive sentences. He concedes his attorney never explicitly raised an objection on this basis below. Accordingly, this claim is forfeited. (*People v. Boyce* (2014) 59 Cal.4th 672, 730.)

---

**19** Prior to the trial court's oral pronouncement, defense counsel had advocated a 30-years-to-life sentence to afford defendant a parole eligibility date within his expected lifetime.

**IV. The abstract of judgment should be corrected.**

The People point out the abstract of judgment incorrectly specifies the conviction on count 6 as a non-violent felony and asks the clerical error be corrected. Robbery is a violent felony, and so we order the correction. (§ 667.5, subd. (c)(9).)

We also note the abstract of judgment describes the crime committed in count 6 and in count 2 as "1ST DEGREE RES BURG," and the crime committed in count 5 as "1ST DEGREE ROBBERY." The crime committed in count 6 and in count 2 was first degree residential robbery. The crime committed in count 5 was first degree burglary. We order those corrections as well.

## DISPOSITION

The trial court is ordered to (1) amend the abstract of judgment to reflect count 6 is a violent felony and a first degree residential robbery, count 2 is a first degree residential robbery, and count 5 is a first degree burglary; and (2) transmit copies thereof to the appropriate authorities. As so modified, the judgment is affirmed.


_____
DETJEN, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
PEÑA, J.

32.